**ENERGY TRANSPORT, LTD. and PT Cabot Indonesia, Plaintiffs,**

v.

**M.V. SAN SEBASTIAN, her freights etc. in rem, Oilmar Co., Ltd., in personam, Defendants.**

No. 03 Civ. 4193(PKL).

United States District Court, S.D. New York.

Dec. 10, 2004.

McDermott & Radzik, New York, New York, for Plaintiffs.

Jeremy J.O. Harwood, Healy & Baillie, LLP, New York, New York, for Defendants.

## OPINION AND ORDER

LEISURE, District Judge.

Defendant, Oilmar Co. Ltd. ("Oilmar"), petitions the Court to compel plaintiff, Energy Transport, Ltd. ("ETL"), to arbitrate pursuant to Chapter 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*; The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Chapter 2"), June 10, 1958, 21 U.S.T. 2517 (codified at Chapter 2 of the FAA, 9 U.S.C. § 201 *et seq.*); The Inter–American Convention on International Commercial Arbitration (the "Inter–American Convention" or "Chapter 3"), January 30, 1975, O.A.S.T.S. No. 42 (codified at Chapter 3 of the FAA, 9 U.S.C. § 301 *et seq.*); and The Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs, ETL and PT Cabot Indonesia ("PT Cabot"), cross-move to compel Oilmar to arbitrate pursuant to Chapter 1 of the FAA only, and also seek a stay of this action pending arbitration pursuant to 9 U.S.C. § 3.[1]

## BACKGROUND

I. *Factual History*

This dispute arises out of a failed attempt to ship a cargo of carbon black feedstock, a low-grade fuel oil residue used for industrial purposes, from the United

Edward C. Radzik, Carolyn Elizabeth Meers, (on Reply Brief), Donovan Parry

1. Plaintiffs' complaint names both Oilmar and M.V. San Sebastian, the vessel owned by Oilmar, as defendants. Plaintiffs are proceeding against Oilmar *in personam* and against the freights of M.V. San Sebastian *in rem.* For the sake of clarity, unless otherwise indicated, the Court will treat Oilmar and M.V. San Sebastian as a single party for purposes of this motion (hereinafter referred to as "defendant").

States to Singapore and Thailand. On March 7, 2003, ETL, a United States corporation, entered into a charter party agreement (the "Charter") with Oilmar, a corporation based in Panama and the owner of the vessel, M.V. San Sebastian. (Defendant's Memorandum of Law in Support of Order Compelling Plaintiff Energy Transport, Ltd. to Arbitrate and for Related Relief ("Def.Mem.") at 1; Affidavit of Jeremy J.O. Harwood, Esq. dated March 9, 2004 ("Harwood Aff.") at 2, attached to Notice of Motion to Compel Plaintiff Energy Transport, Ltd. to Arbitrate and for Related Relief.) As the charterer, ETL agreed to pay Oilmar a certain "freight rate" for the use of the M.V. San Sebastian in shipping the cargo. (Harwood Aff., Ex. 2.) The cargo consisted of three separate parcels of carbon black feedstock, which ETL and Oilmar agreed to ship to three different parties pursuant to three bills of lading.[2] (Def. Mem. at 4.) Under the bills of lading, ETL and Oilmar agreed to ship the parcels to Thai Carbon Black Public Company, Glencore Limited, and PT Cabot. (Def. Mem. at 4–6.)

It should be noted that ETL was at all relevant times a wholly owned subsidiary of the Cabot Corporation ("Cabot") and PT Cabot was at all relevant times approximately 85% owned by Cabot. (Declaration of Kenneth F. Burnes dated May 27, 2004 ¶¶ 3–4, attached as Exhibit A to Affidavit of Edward C. Radzik, Esq. in Support of ETL's and PT Cabot's Reply.) Headquartered in Boston, Massachusetts, Cabot is a global specialty chemicals and materials company that produces, sells and distributes carbon black. (*Id.* ¶¶ 7–8.) Carbon black, produced using carbon black feedstocks, is used in the manufacture of tires, industrial rubber products, plastics and other products. (*Id.* ¶¶ 8–9.) As a subsid-

iary of Cabot, ETL buys and sells carbon black feedstock and charters marine vessels for its transport. (*Id.* ¶ 12.) PT Cabot owns and operates two carbon black production facilities in Indonesia. (*Id.* ¶ 11.)

On or about May 2, 2003, while crossing the Red Sea, the M.V. San Sebastian suffered a fire and explosion, which caused the deaths of three crew members and extensive damage to the ship and its cargo. (Def. Mem. at 3.) The parties agreed to transfer the cargo to another vessel for delivery on to Singapore and Thailand. (*Id.*)

## II. Procedural History

On June 10, 2003, ETL commenced the underlying action in the Southern District of New York, alleging that Oilmar was negligent and breached the contracts of carriage. In the Complaint, ETL sought a maritime attachment of funds payable to Oilmar under Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims. On June 18, 2003, this Court vacated the initial attachment because it was not served on the proper garnishee and it could not be served on the proper garnishee because the proper garnishee was located in Connecticut. *See Energy Transp., Ltd. v. M.V. San Sebastian,* No. 03–4193, 2003 WL 21415267, *2, 2003 U.S. Dist. LEXIS 10306, at *5 (S.D.N.Y. June 18, 2003).

On June 26, 2003, ETL filed an amended complaint, which added PT Cabot as the second plaintiff, and renewed the motion for attachment of Oilmar funds pursuant to Rule B(1), and added a petition for attachment pursuant to Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims. In this Court's ab-

---

2. A bill of lading is a document of title acknowledging receipt of goods by a carrier or by the shipper's agent. *See* Black's Law Dictionary 159 (7th ed.1999).

sence, Judge Jed S. Rakoff denied plaintiffs' motion for attachment under Rule B(1) the same day, concluding that attachment was not warranted because Oilmar conducted sufficient business activity in New York. *See* Rakoff Opinion and Order dated June 26, 2003 (unpublished). On June 28, 2003, Judge Rakoff rejected plaintiffs' request for a Rule C(3) arrest of unpaid freights because the freights at issue had already been paid to Oilmar. *See Energy Transp., Ltd. v. M.V. SAN SEBASTIAN*, 269 F.Supp.2d 416, 418–19 (S.D.N.Y.2003).[3]

On July 1, 2003, PT Cabot (without ETL) filed a complaint in the District of Connecticut against Oilmar and also sought attachment of certain Oilmar funds, premised on the same theories of negligence and breach as the New York action. Notably, the complaint addressed the damages incurred by PT Cabot only and did not reference ETL. At this time, the parties with interests in the other two parcels of carbon black feedstock aboard the M.V. San Sebastian instituted similar suits in Connecticut. On August 18, 2003, Chief Judge Christopher F. Droney of the District of Connecticut, after consolidating all of the related actions, ruled that Rule B attachments were proper for PT Cabot and the other interested parties because Oilmar did not conduct sufficient business activity within the state. *See Oilmar v. Energy Transp., Ltd.*, 2003 WL 21976599, 2, 2003 U.S. Dist. LEXIS 14350, at *10 (D.Conn. Aug. 18, 2003).

On September 3, 2003, Edward Radzik, counsel for both ETL and PT Cabot, sent a letter to Jeremy Harwood, counsel for Oilmar. In the letter, Mr. Radzik stated that he was writing on behalf of PT Cabot and its cargo underwriters and formally demanded arbitration of PT Cabot's claims against Oilmar pursuant to the arbitration clause in the Charter, which, Mr. Radzik asserted, was incorporated into the bill of lading issued to PT Cabot. (Affidavit of Edward C. Radzik, Esq. in Support of ETL and PT Cabot's Motion to Compel Arbitration dated April 26, 2004 ("April 26 Radzik Aff."), Ex. 3.) Further, Mr. Radzik provided the name of their selection for the arbitration panel and requested that Oilmar appoint an arbitrator so that the two nominees could select a third arbitrator pursuant to the terms of the arbitration clause. *Id.*

On September 23, 2003, Mr. Harwood responded to Mr. Radzik's letter. In his letter, Mr. Harwood specifically objected to being served with the arbitration demand because, he maintained, the arbitration clause requires that the demand be served on an officer of Oilmar. (Harwood Aff., Ex. 10.) However, "solely to avoid the potential for a default arbitration," Mr. Harwood provided Mr. Radzik with the name of the arbitrator nominated by Oilmar. *Id.* Finally, Mr. Harwood specifically reserved Oilmar's right to demand arbitration of its claims against ETL arising out of ETL's alleged failure to pay freight and

---

**3.** ETL and PT Cabot appealed all three attachment rulings to the Second Circuit. On February 26, 2004, this Court "so ordered" plaintiffs' Notice of Voluntary Dismissal of the underlying action. Shortly thereafter, defendant alerted the Court to the fact that plaintiffs' appeal had not yet been properly withdrawn, and requested that the Court vacate the Notice of Voluntary Dismissal on the grounds, *inter alia*, that the Court lacked jurisdiction to dismiss the case while the appeal was pending. With plaintiffs' consent, the Court vacated the dismissal and directed plaintiffs to re-file the Notice of Voluntary Dismissal after the appeal was properly withdrawn. *See* Order dated March 3, 2004. Subsequent to the order, however, defendant filed a verified answer and the instant motion to compel arbitration.

demurrage.[4]

On January 20, 2004, in a letter addressed to Mr. Radzik and Kenneth F. Burnes, Chairman of ETL, Mr. Harwood, on behalf of Oilmar, demanded arbitration of Oilmar's claim against ETL for freight and demurrage. (Harwood Aff., Ex. 11.) In the letter, Oilmar indicated that it had appointed a different arbitrator to consider this claim than the one it had previously appointed in response to PT Cabot's demand, revealing its position that a second arbitration panel was appropriate for Oilmar's claims. (*Id.*)

In a letter dated January 23, 2004, Mr. Radzik challenged Oilmar's attempt to initiate a second arbitration proceeding, relying upon the language of the arbitration clause, which allegedly permits only a single proceeding. (April 26 Radzik Aff., Ex. 8.) Further, Mr. Radzik contended that any claims Oilmar may have against ETL should be addressed by the first panel because PT Cabot "stood in the shoes" of ETL when it made the arbitration demand upon Oilmar. (*Id.*)

Over the course of the following weeks, Messrs. Harwood and Radzik engaged in an exchange of letters concerning the competing arbitration demands that appears to have been entirely unproductive and below the standard of professionalism, which is the hallmark of the maritime bar. Indeed, on more than one occasion, Charles L. Trowbridge, Esq., who was appointed chairman of the first arbitration panel and who has performed admirably in that role,

found it necessary to chastise counsel for not treating one another and the panel with sufficient courtesy and respect. (April 26 Radzik Aff., Exs. 10, 13.) Although arbitration hearing dates were set, ultimately, the parties decided it was preferable to turn to the Court for resolution.

On March 9, 2004, Oilmar filed the present petition to compel arbitration of its claims against ETL for freight and demurrage. Oilmar argues, *inter alia,* that PT Cabot's arbitration demand concerned only PT Cabot's claims against Oilmar arising under the bill of lading. The demand did not include any claims that ETL may have had against Oilmar arising under the Charter because PT Cabot made the demand in its own name (and the name of its cargo underwriters) and PT Cabot's bill of lading is separate and distinct from the Charter between ETL and Oilmar. Thus, Oilmar maintains that a second arbitration panel is appropriate to consider Oilmar's Charter-based claims and asks the Court to ensure that panel's independence from the first panel, which should only consider PT Cabot's bill of lading-based claims.

On April 26, 2004, ETL and PT Cabot filed their opposition to Oilmar's petition and their cross-motion to compel Oilmar to arbitrate PT Cabot's claims against Oilmar and Oilmar's claims against ETL before a single arbitration panel.[5] ETL and PT Cabot assert, *inter alia,* that, as subsidiaries of Cabot, they are affiliated companies and as such, they maintain a "unity of

---

4. Demurrage is "a liquidated penalty owed by charterer to a shipowner for the charterer's failure to load or unload cargo by a certain time." Black's Law Dictionary 444 (7th ed.1999).

5. In briefing their respective motions, it appears to the Court that counsel subscribed to the belief that quantity is at least as important as quality. Following its moving papers, Oilmar filed three additional submissions, in-

cluding a sur-reply without leave of the Court. Following their moving papers, ETL and PT Cabot filed two additional submissions. At a pre-motion conference, the Court admonished both parties for raising new arguments in their reply papers and permitted Oilmar, as the movant, to submit an additional set of papers. *See* Transcript dated July 15, 2004, at 28.

interest" with respect to their claims against Oilmar. (April 26 Radzik Aff., Ex. 8.) Moreover, they contend that the arbitration clause provides for a single arbitration panel to consider any and all disputes arising out of the Charter. Therefore, plaintiffs request a stay of the underlying action so that the arbitration panel that has already been formed may rule on the claims against Oilmar and ETL.

## DISCUSSION

The parties' competing motions to compel arbitration raise several issues for the Court to decide. In particular, the Court must determine (1) whether ETL and PT Cabot have standing to bring the underlying claim and the instant cross-motion; (2) the proper basis for the Court's power to compel the parties to arbitrate each set of claims; and (3) whether the two sets of claims should be arbitrated before a single panel or two different panels.

### I. *Standing*

■■■ As a threshold matter, defendant argues that neither ETL nor PT Cabot have standing to bring the underlying action. Section 2 of Article III of the United States Constitution states that the authority of the federal judiciary "shall extend to" certain described "Cases" and "Controversies." To implement effectively the case-or-controversy requirement, the courts have developed the doctrine of standing, which limits a plaintiff's ability to invoke the power of the federal courts. "The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus, the issue of standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Id.*

■■■ The burden of establishing that the requirements of standing have been satisfied rests with the party seeking to invoke the jurisdiction of the court. *See Jaghory v. New York State Dep't. of Educ.*, 131 F.3d 326, 329 (2d Cir.1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In order to satisfy the constitutional requirement of standing, every federal plaintiff must establish three elements:

> (1) that she suffered an 'injury in fact— an invasion of a legally protected interest' that is 'concrete and particular,' and not merely hypothetical; (2) that there is 'a causal connection between the injury and the conduct complained of;' and (3) that it is 'likely that the injury will be redressed by a favorable decision.'

*United States v. Vazquez*, 145 F.3d 74, 80 (2d Cir.1998) (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

■■■ In addition to the constitutional requirements, there are judicially created, prudential limitations on the power of the federal courts. Specifically, courts must determine whether a plaintiff's claim is based on the legal rights of a third party, asserts only a generalized grievance, or advances an argument that falls beyond the zone of interests protected by the legal provision invoked. *See Valley Forge Christian College v. Americans United*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Matter of an Application for Appointment of Independent Counsel*, 766 F.2d 70, 74 (2d Cir.1985). Thus, the prudential standing inquiries prohibit federal courts "from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. 752. Finally, the Court must

recognize that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... [as] we 'presume that general allegations embrace those specific facts that are necessary to support the claim.' " *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 (quoting *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

In the Complaint, Plaintiffs allege that they incurred damages to their cargo and were forced to provide securities for general average and salvage expenses because of the explosion aboard the M.V. San Sebastian, which was the result of defendant's negligence, dereliction of duty, and breach of contract. (Complaint ("Compl."), ¶¶ 15–16.) Additionally, plaintiffs contend that ETL is entitled to indemnity and/or contribution from defendant for any claims that may be asserted against it by other interested parties who may have suffered damages from the explosion. (*Id.* ¶ 20.)

Defendant maintains that neither plaintiff has standing because Cabot has been fully compensated by Atlantic Mutual Insurance Company ("Atlantic") for the losses sustained by its two subsidiaries. (Oilmar Co. Ltd.'s Supplemental Memorandum of Law in Reply to Energy Transport, Ltd.'s Additional Opposition to the Motion and in Further Opposition to the New Law and Facts Stated in Support of Plaintiffs' Cross–Motion ("Def.Sur–Rep.") at 4–6.) Moreover, even if Cabot has not been fully compensated,

defendant contends that Cabot, not ETL or PT Cabot, is the subrogor of Atlantic and is the only party, other than Atlantic, that may have standing to institute the underlying claim. (*Id.* at 5.)

At the outset, the Court observes that this issue could have been addressed more coherently by the parties had plaintiffs' counsel been more forthcoming with information regarding the insurance policy with Atlantic. Specifically, plaintiffs should have disclosed in their initial papers that Cabot had not been reimbursed by Atlantic for the two-percent deductible on the policy. Instead, plaintiffs, without any reasonable justification,[6] first revealed this fact in their reply papers, after defendant had devoted considerable attention to the issue in its opposition papers under the erroneous belief that Atlantic was a fully subrogated insurer. (Energy Transport Limited's and PT Cabot Indonesia's Memorandum of Law in Reply to Oilmar Co., Ltd. Panama's Opposition to Energy Transport, Ltd. and PT Cabot's Cross Motion to Compel Arbitration ("Pl.Rep.") at 5–6.) To ensure that defendant was afforded an adequate opportunity to address this new information, the Court allowed defendant to submit an additional set of papers.

Notwithstanding the manner in which this issue was handled, the Court finds that plaintiffs have standing to bring the underlying claims. Defendant's primary argument, that plaintiffs do not have standing because they have received insurance proceeds for their claimed losses, ig-

---

**6.** Plaintiffs intimate that their failure to raise the non-payment of the deductible by Atlantic in their first set of papers was due to the fact that Atlantic only recently completed making its payments to Cabot. (Pl. Rep. at 6; Affidavit of Edward C. Radzik, Esq. In Support of Energy Transport Limited's and PT Cabot Indonesia's Reply dated May 27, 2004, ¶ 7.) However, the Court is not persuaded as the

second and final payment was made by Atlantic to Cabot by check dated February 24, 2004 and plaintiffs made their initial filing on April 26, 2004. (Affidavit of Edward C. Radzik, Esq. In Support of ETL's and PT Cabot's Response to Oilmar's Supplemental Memorandum of Law dated July 30, 2004 ("July 30 Radzik Aff."), Ex. 1, at seventh unnumbered page.)

nores the fact that the proceeds constitute only a fraction of the damages alleged by plaintiffs in the Complaint. According to records submitted by plaintiffs, Atlantic paid Cabot a total of $1,428,455.66 for the claimed losses. (July 30 Radzik Aff., Ex. 1, at third unnumbered page.) Pursuant to PT Cabot's instructions, Cabot distributed $452,215.32 to various third parties for expenses related to the explosion, used $876,261 to repay an existing debt owed by PT Cabot to Cabot, and retained the remaining $99,979.34 for future use by PT Cabot. (*Id.*) Plaintiffs seek $2,920,000 in damages, more than twice the amount received from Atlantic. (Compl., ¶ 18.) Thus, without even considering the fact that the deductible was not reimbursed, plaintiffs have not been fully compensated for their alleged losses, as defendant's argument assumes. Thus, at this preliminary stage, the Court finds that plaintiffs' general allegations establish (1) an injury in fact to their interests in the carbon black feedstock; (2) that is sufficiently connected to defendant's alleged negligence in maintaining the vessel; and (3) that this injury could be redressed by a decision favorable to plaintiffs. *See Vazquez,* 145 F.3d at 80.

 Before proceeding, the Court finds it necessary to point out that ETL and PT Cabot, in addition to having standing, are real parties in interest in this action. Relying again on Atlantic's insurance payment to Cabot, defendant repeatedly challenges plaintiffs' cross-motion on the grounds that Atlantic is the only real party in interest because it compensated plaintiffs for their claimed damages. (Def. Mem. at 11–12; Def. Rep. at 11–14; Def. Sur–Rep. at 3–6.) Rule 17(a) states "every action shall be prosecuted in the name of the real party of interest." Fed.

R.Civ.P. 17(a). The rule embodies the concept that every action must be brought by the party who, under the governing substantive law, is entitled to enforce the right at issue. *See* 6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 1543, at 334 (2d ed.1990). Indeed, "the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Fed. R.Civ.P. 17 advisory committee's note to the 1966 amendment.

Although the doctrine of standing and the concept of real party in interest are related in that each focuses on who may initiate a claim, the former, as discussed above, stands upon a constitutional foundation and triggers the power of the federal judiciary, while the latter is simply a procedural requirement. *See Airlines Reporting Corp. v. S and N Travel, Inc.,* 58 F.3d 857, 861 n. 4 (2d Cir.1995) ("Rule 17(a) . . . is a procedural rule which does not extend or limit the subject matter jurisdiction of a federal court."). For present purposes, it is clear that ETL and PT Cabot are entitled to enforce their rights under the Charter and the bill of lading and thus, they are proper parties in interest under Rule 17(a).[7]

## II. *Proper Basis to Compel Arbitration*

In addition to standing, the parties differ with respect to another threshold issue, namely the basis of the Court's power to compel arbitration. The Court's power to compel arbitration in this context derives from Title 9 of the United States Code, wherein the entire body of federal law

---

7. The parties did not specifically address whether other parties, such as Atlantic or

Cabot, should be joined to the action as real parties in interest.

governing the subject of arbitration is codified. That Title contains three separate but inter-connected chapters. Chapter 1 contains the original Federal Arbitration Act adopted in 1925 and incorporates §§ 1–16 of Title 9. Chapter 2, comprising §§ 201–208, gives effect to the New York Convention of 1958. Finally, Chapter 3, enacted in 1990, implements the Inter–American Convention of 1975 in §§ 301–307. All three of the chapters together constitute the current Federal Arbitration Act.[8]

A brief overview of the historical development of the three chapters may further an understanding of their application to the present controversy. Historically, the judiciary viewed arbitration agreements with some disdain for their ability to preclude courts from adjudicating future claims. As a result, these agreements were typically deemed invalid or unenforceable. See *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Kulukundis Shipping Co., S/A v. Amtorg Trading Corp.*, 126 F.2d 978, 984–85 (2d Cir.1942). With the passage of the original Federal Arbitration Act in 1925, Congress challenged this long-standing judicial aversion to arbitration, declaring that a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. While the legislation provided federal courts with tools to recognize and enforce agreements, including the authority to stay litigation that contravenes the parties' contractual

obligation to arbitrate, see 9 U.S.C. § 3, to compel parties to arbitrate disputes covered by their agreement, see 9 U.S.C. § 4, and to confirm awards rendered pursuant to valid arbitration, see 9 U.S.C. § 9, it contained certain jurisdictional and venue limitations that actually may have reduced the courts' ability to recognize and enforce arbitration agreements covering international transactions. See generally Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L.J. 1049, 1050, 1057 (1961).

To remedy these constraints, Congress ratified the New York Convention and passed the accompanying Enabling Act, which is codified in Chapter 2 of Title 9. The New York Convention was the product of a United Nations conference held in New York in 1958 that attempted to correct the procedural and jurisdictional anomalies that had undermined the efficacy of two prior international agreements— the 1923 Geneva Protocol on Arbitration Clauses and the 1927 Geneva Convention on the Execution of Foreign Awards. See *Smith/Enron Cogeneration Ltd. Part., Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 93 (2d Cir.1999); *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 930–31 (2d Cir.1983). The codification of the New York Convention was designed to empower federal courts to recognize and enforce qualifying arbitration agreements between and among parties of signatory states, without the traditional jurisdictional limits based on the citizenship of the parties to the agreement and the locus of the matter

---

**8.** The Court observes that the relevant case law exhibits a certain inconsistency in the use of the terms "Federal Arbitration Act," "Arbitration Act," and "FAA." On occasion, these terms are employed to refer only to the provisions of Chapter 1, the original Federal Arbitration Act, or to the provisions of Chapters 1 and 2 together. To be clear, the Court considers these terms to apply properly only to the statute as a whole, and will utilize them accordingly.

in dispute. *See Smith/Enron,* 198 F.3d at 93–94; *Bergesen,* 710 F.2d at 931, 933. The New York Convention applies to actions involving both foreign and American entities that primarily involve performance abroad of contracts executed in the United States. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 146 (2d Cir.2001); *Chelsea Square Textiles, Inc. v. Bombay Dyeing and Mfg. Co., Ltd.,* 189 F.3d 289, 294 (2d Cir.1999); *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 19 (2d Cir.1997). It may not be invoked for an agreement or award arising out of a contract concerning only American parties, unless that relationship involves property located abroad, contemplates performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. *See* 9 U.S.C. § 202.

In 1975, nearly 20 years after the adoption of the New York Convention, the First Specialized Inter–American Conference on Private International Law promulgated the Inter–American Convention on International Commercial Arbitration, which was designed to be fully compatible with the New York Convention. *See* John P. Bowman, *The Panama Convention and its Implementation Under the Federal Arbitration Act,* 11 Am. Rev. Int'l. Arb. 1, 20 (2000). The Inter–American Convention addressed the growing need for a measure of consistency and uniformity in the recognition and enforcement of arbitral awards in Latin America, which were previously governed by a collection of treaties that were generally viewed as ineffective. *Id.* at 7–8. There is considerable overlap between the provisions and the signatories of the New York and Inter–American Conventions. Indeed, according to the House Report by the Judiciary Committee accompanying the bill implementing the Inter–American Convention in the United States:

The New York Convention and the Inter–American Convention are intended to achieve the same results, and their key provisions adopt the same standards, phrased in the legal style appropriate for each organization. It is the Committee's expectation, in view of that fact and the parallel legislation under the Federal Arbitration Act that would be applied to the Conventions, that courts in the United States would achieve a general uniformity of results under the two conventions.

H.R.Rep. No. 501, 101st Cong., 2d Sess. 4 (1990), *reprinted in* 1990 U.S.C.C.A.N. 675, 678; *see also* President's Message to the Senate Transmitting the Inter–American Convention on Commercial Arbitration, 1981 Pub. Papers 517 (June 15, 1981) ("This Convention is similar in purpose and effect to the New York Convention . . . ."). Further, both Conventions incorporate the provisions of Chapter 1 to the extent they do not conflict, *see* 9 U.S.C. §§ 208, 307, and the Inter–American Convention expressly adopts several of the key sections of the New York Convention. *Id.* at § 302 ("Sections 202, 203, 204, 205, and 207 of this title shall apply to this chapter [9 U.S.C. § 310 *et seq.*] as if specifically set forth herein . . . ."). Of most significance to the instant dispute, the sections within each Convention pertaining to a court's power to compel arbitration contain identical language. *See* 9 U.S.C. §§ 206, 303 ("A court having jurisdiction under this chapter may direct the arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.").

Although the Conventions are analogous in most material respects, there are differences between them, one of which is particularly noteworthy. There is an important, if subtle, divergence in their fields of application. While the New York Conven-

tion limits itself to awards considered foreign in the State where their recognition and enforcement are sought, the Inter–American Convention applies more generally to awards resulting from international commercial arbitration. *See* Bowman, 11 Am. Rev. Intl. Arb. at 36–37. For example, if parties sought enforcement in the United States of an award rendered in Panama, involving only Panamanian citizens conducting a domestic transaction, the New York Convention would likely apply but the Inter–American Convention would not because of the award's purely domestic character. Conversely, if parties sought enforcement in the United States of an award rendered in the United States involving Panamanian and American citizens conducting an international transaction, the Inter–American Convention may be invoked but the New York Convention would not apply because enforcement of the award is being sought in the same state in which the award was issued. Cognizant of the historical development of Title 9, the Court now turns to the parties' arguments concerning the power to compel arbitration.

██ Defendant initially sought to compel ETL to arbitrate claims under the

Charter pursuant to Chapter 1, the New York Convention, the Inter–American Convention, and The Declaratory Judgment Act, 28 U.S.C. § 2201. (Def. Mem. at 1.) However, defendant did not thoroughly address the applicability of The Declaratory Judgment Act. (Def. Mem. at 10.) Moreover, in its subsequent papers, defendant denied that it ever relied upon Chapter 1, claiming that it "expressly requested relief under and solely under the Conventions...." (Def. Sur–Rep. at 2.)[9] Despite its initial pleading, defendant maintains that only the New York and Inter–American Conventions, and not Chapter 1, can serve as the basis for the Court's power to compel arbitration of any claims because the Conventions, as treaties of the United States, are the "supreme law of the land."[10] (Def. Rep. at 9–10; Def. Sur–Rep. at 1–3.)

██ Plaintiffs seek to compel defendant to arbitrate both sets of claims before a single panel pursuant to Chapter 1 only and did not invoke either Convention. Thus, the question before the Court is whether plaintiffs may rely upon Chapter 1, and not the Conventions, in their request that the Court compel defendant to arbitrate and stay the underlying action.

---

9. Surprisingly, defendant maintains this position even though, in addition to citing to Chapter 1 in the opening paragraph of its moving papers, it quotes Section 4 of Chapter 1, the operative provision for a motion to compel arbitration, later in the papers. (Def. Mem. at 6.)

10. The Court notes that, to the extent defendant seeks relief pursuant to both Conventions, only the Inter–American Convention will apply. The New York Convention applies to defendant's motion because the agreement at issue, the Charter, "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial...." 9 U.S.C. § 202. The Inter–American Convention may be invoked as well because it expressly incorporates Section 202 of the New

York Convention. *See* 9 U.S.C. § 302. However, the Inter–American Convention provides that when both Conventions apply, if a majority of the parties to the arbitration agreement are citizens of states that are signatories to the Inter–American Convention and are member states of the Organization of American States, the Inter–American Convention must govern. *See* 9 U.S.C. § 305. The parties to the Charter, ETL and Oilmar, hail from the United States and Panama, respectively, both of which are signatories to the Inter–American Convention and members of the Organization of American States. Accordingly, Chapter 3 is the operative chapter for defendant's claim and Section 303 is the proper basis for defendant's motion to compel arbitration.

Plaintiffs do not challenge defendant's preference for using the Conventions as a basis for the Court to compel the arbitration of defendant's claims against ETL. (Pl. Rep. at 3.) Rather, plaintiffs argue that Chapter 1 may properly apply to its cross-motion because the Conventions only supersede Chapter 1 to the extent there is a conflict and the provisions relating to compelling arbitration and issuing a stay do not conflict. (*Id.*)

The Court finds that the Conventions do not supercede Chapter 1 in this instance and thus, plaintiffs may bring their cross-motion pursuant to Chapter 1. Although the Conventions are treaties that have been codified within Title 9, they do not necessarily pre-empt Chapter 1, the original Federal Arbitration Act, in all respects.[11] By their express terms, the Conventions, as codified in Chapters 2 and 3, permit provisions from Chapter 1 to apply to actions brought pursuant to one of the other two chapters provided there is no conflict. *See* 9 U.S.C. §§ 208, 307. Indeed, the Second Circuit has recognized that all of the Chapters may apply to a given case absent a conflict. *See Yusuf,* 126 F.3d at 20; *Bergesen,* 710 F.2d at 934 ("There is no reason to assume that Congress did not intend to provide overlapping coverage between the [New York] Convention and [Chapter I of] the Federal Arbitration Act."); *see also Oil Basins Ltd. v. Broken Hill Proprietary Co. Ltd.,* 613 F.Supp. 483, 486 (S.D.N.Y.1985).

More specifically, the provisions relating to the Court's power to compel arbitration within each of the three Chapters do not conflict in this instance. Section 4 of Chapter 1 permits a party to an arbitration agreement claiming breach to bring an action in a federal court having jurisdiction over the matter:

for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.

9 U.S.C. § 4.

■ In cases where the agreement provides for arbitration beyond the district of the deciding court, the plain language of this section is inherently contradictory because it directs the court to compel arbitration according to the terms of the agreement but limits the authority of the court to direct arbitration within its district only. As a result, "[a] district court compelling arbitration under § 4 lacks the power to order arbitration to proceed outside its district." *See DaPuzzo v. Global-*

---

11. Defendant repeatedly cites to *Filanto, S.p.A. v. Chilewich Intern. Corp.,* as requiring parties to seek relief under the Conventions, even in cases where relief under Chapter 1 is also available. 789 F.Supp. 1229 (S.D.N.Y. 1992), *appeal dismissed,* 984 F.2d 58 (2d Cir. 1993). Defendant relies upon the *Filanto* court's statement that the New York Convention "controls any case in any American court falling within its sphere of application." *Id.* at 1236. In proffering this argument, defendant fails to appreciate the meaning of the statement in its proper context. The statement was intended to support the court's determination that federal law, rather than state law, governs the question of whether the parties agreed to arbitrate their disputes. Thus, it reflected the court's view of the New York Convention's applicability with respect to state law. There is no indication that it was intended to apply to cases, like the present one, that involve the interplay of the Conventions with federal law and specifically, Chapter 1 of Title 9.

vest Mgmt. Co., 263 F.Supp.2d 714, 727 (S.D.N.Y.2003) (quoting *Jain v. de Mere,* 51 F.3d 686, 690 (7th Cir.), *cert. denied,* 516 U.S. 914, 116 S.Ct. 300, 133 L.Ed.2d 206 (1995)); *see also Provident Bank v. Kabas,* 141 F.Supp.2d 310, 319 (E.D.N.Y.2001); *Oil Basins,* 613 F.Supp. at 487.

Conversely, the related provisions within Chapters 2 and 3 allow the court to "direct that arbitration be held in accordance with the agreement at any place therein provided for, *whether that place is within or without the United States.*" 9 U.S.C. §§ 206, 303 (emphasis added). Thus, under the Conventions, a court may compel the parties to proceed to arbitration not only outside of its district, but outside of the country. Consequently, in cases where both Chapter 1 and the Conventions apply, a potential conflict may arise between § 4 on the one hand and §§ 206 and 303 on the other. The Seventh Circuit has addressed this possibility, with respect to § 4 and § 206, and concluded the following:

> Without question, chapter 2 incorporates § 4 to some degree. Where an arbitration agreement specifies an arbitration site, § 4 is admittedly incompatible with Chapter 2. If the agreement calls for arbitration within the district in which the action is brought, both § 4 and § 206 permit the court to compel arbitration there; section 4 is at most redundant. If the agreement calls for arbitration outside of the district in which the action is brought, the limits of § 4 directly conflict with the district court's powers under § 206 and § 208 would render § 4 inapplicable.

*Jain,* 51 F.3d at 690; *see also DaPuzzo,* 263 F.Supp.2d at 728 n. 10.

The Court agrees with this analysis to the extent that it finds the two sections to be in accord, when an arbitration agreement provides for arbitration within the district in which the action is brought, but at odds when the venue for arbitration is beyond the court's district. Here, the arbitration clause lists New York as the site for arbitration proceedings. Thus, in this instance, it is possible for the Court to compel the parties to arbitrate within its district in compliance with § 4, without engendering a conflict with § 206 or its Chapter 3 analog, § 303.

██ Finally, plaintiffs also seek a stay of this proceeding pursuant to § 3 of Chapter 1. Neither Chapter 2 nor Chapter 3 makes specific reference to the court's power to stay the action while arbitration proceeds. Consequently, the Court discerns no conflict in this area, and § 3 may be fully incorporated into both Chapter 2 and Chapter 3. *See* 9 U.S.C. §§ 208, 307. Accordingly, plaintiffs may cross-move to compel defendant to arbitrate pursuant to § 4, and request a stay of these proceedings pursuant to § 3.[12]

### III. *The Arbitration Clause*

#### A. *Federal Policy Toward Arbitration*

██ Before turning to the merits of the parties' dispute, the Court notes that federal policy seeks to promote arbitration as an alternative means of dispute resolution. *See JLM Indus. v. Stolt–Nielsen SA,* 387 F.3d 163, 171 (2d Cir.2004); *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.,* 246 F.3d 219, 226 (2d Cir.2001). This Court has stated that "[i]t is fundamental that arbitration agreements are creatures of contract law." *Scher v. Bear Stearns & Co.,* 723 F.Supp. 211, 214

---

12. As noted in footnote 10, *supra,* defendant's petition will proceed pursuant to § 303 of the Inter–American Convention.

(S.D.N.Y.1989). As in any other instance of contract interpretation, "the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

 To that end, as discussed above, the Federal Arbitration Act provides courts with a panoply of tools designed to encourage parties to resolve by arbitration matters within the scope of their agreement. *See* Part II *supra;* 9 U.S.C. § 1 *et seq.* The Supreme Court has directed the lower courts to maintain a "healthy regard" for the Act's underlying policy and to resolve any doubts concerning the scope of arbitrable issues in favor of arbitration. *See Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Chelsea Square Textiles,* 189 F.3d at 294. Notably, "[t]he federal policy favoring the liberal enforcement of arbitration clauses ... applies with particular force in international disputes." *Paramedics Electromedicina Comerical, Ltda. v. GE Med. Sys. Info. Techs., Inc.,* 369 F.3d 645, 654 (2d Cir.2004); *see also Threlkeld,* 923 F.2d at 248 ("Enforcement of international arbitral agreements promotes the smooth flow of international transactions by removing the threats and uncertainty of time-consuming and expensive litigation."). Thus, when considering a motion to compel arbitration under the Federal Arbitration Act, a court must determine: "(1) whether there exists a valid agreement to arbitrate at all under the contract in question ... and if so, (2) whether the particular disputes sought to be arbitrated fall within the scope of the arbitration agreement." *Hartford Accident,* 246 F.3d 219 (quotation and citation omitted).

For the purposes of the motions now before the Court, the parties' primary dispute relates to, not whether the two sets of claims should be arbitrated, but how they should be arbitrated. Defendant argues that two arbitration panels are appropriate because PT Cabot's claims against Oilmar and Oilmar's claims against ETL "arise out of different obligations of the parties" concerning "different provisions of different agreements." (Def. Rep. at 26.) Meanwhile, plaintiffs maintain that both sets of claims arise under the Charter and that the plain language of the arbitration clause provides that all claims arising under the Charter must be brought before a single arbitration panel. (Memorandum of Law in Support of Energy Transport, Ltd. and PT Cabot's Cross Motion to Compel Arbitration and In Opposition to Oilmar's Memorandum of Law in Support of Order Compelling Plaintiff Energy Transport, Ltd. to Arbitrate and for Related Relief ("Pl.Mem.") at 16–17.)

### B. *The Agreements: The Charter and the Bill of Lading*

On March 7, 2003, ETL, as the charterer, and Oilmar, as the owner, entered into the Charter, which provided that ETL would pay Oilmar a certain freight rate for use of Oilmar's vessel, the M.V. San Sebastian, to transport carbon black feedstock to the Far East. The Charter contained an arbitration clause declaring in pertinent part:

> Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the city of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Char-

terer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final.

(April 26 Radzik Aff., Ex. 1, at fourth unnumbered page.)

In Part I of the Charter, the parties agreed that New York would be the site of arbitration proceedings. (*Id.*, at second unnumbered page.) Further, the Charter contained a section entitled "Issuance and Terms of Bills of Lading." That section directed the master of the ship to sign bills of lading upon request for all cargo shipped "without prejudice to the rights of the Owner and Charterer under the terms of [the] Charter." (*Id.*, at fourth unnumbered page.) A model bill of lading form was attached to the Charter for reference. (*Id.*, at fifth unnumbered page.)

On April 1, 2003, a bill of lading was signed on behalf of the master of the M.V. San Sebastian for approximately 133,800 barrels of carbon black feedstock oil to be delivered to PT Cabot in Singapore. (*Id.*, Ex. 2.) While the PT Cabot bill of lading was not identical to the form attached to the Charter, it was substantially similar in every material respect. The bill of lading provided:

> This shipment is carried under and pursuant to the terms of the Charter dated March 7, 2003 at Stamford, CT between Oilmar Co. Ltd, Panama and Energy Transport Ltd. of the said Charter [sic] except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

(*Id.*)

Although not addressed by counsel, it is evident to the attentive reader that this provision does not make grammatical sense in its present form, as some language is missing. After reviewing the corresponding sections of the bills of lading for the two other parcels of cargo aboard the M.V. San Sebastian, which are otherwise identical to the provision in question, it appears to the Court that the following language is absent after "Energy Transport Ltd."—", as Charterer, and all the terms whatsoever." (Harwood Aff., Ex. 3, 7.) Thus, the section should read:

> This shipment is carried under and pursuant to the terms of the Charter dated March 7, 2003 at Stamford, CT between Oilmar Co. Ltd, Panama and Energy Transport Ltd., as Charterer, and all the terms whatsoever of the said Charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

■■■■■ The cardinal doctrines of contract interpretation instruct courts to read a contractual document in a manner that confers meaning upon all of its terms and renders the terms consistent with one another. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Moreover, courts should avoid an interpretation that makes a contractual provision superfluous. *See Int'l Multifoods Corp. v. Commercial Union Ins., Co.*, 309 F.3d 76, 86 (2d Cir.2002); *see also* Rest.2d of Contracts, § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). Accordingly, without any guidance from the parties, the provision should be read in a reasonable and logical manner. Due primarily to the unusual combination of punctuation and words missing from this standard form bill of lading, the Court finds that the omission was not deliberate. It will presume that the parties understood that the provision should have contained the missing language and was designed to apply the terms of Charter, excluding the

noted exceptions, to the parties to the bill of lading.

C. *The Arbitration Clause Is Incorporated By Reference into the Bill of Lading*

It is well established that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see also Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125, 131 (2d Cir.2003) (per curiam). In this case, Oilmar may demand arbitration of ETL pursuant to the Charter's arbitration clause because both are signatories to the Charter. However, it is not as clear how PT Cabot, a party to the bill of lading but not the Charter, can demand arbitration of Oilmar pursuant to the Charter's arbitration provision.

An agreement to arbitrate may be found when an arbitration provision is incorporated by reference into an agreement to which the party sought to be compelled agreed. *See Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 777 (2d Cir.1995). Thus, "the terms of a charterparty, including an arbitration clause, may, by appropriate reference, be incorporated into a bill of lading." *Coastal States Trading, Inc. v. Zenith Navigation S.A.,* 446 F.Supp. 330, 338 (S.D.N.Y.1977) (Motley, J.). Moreover, it has been established in this Circuit that "a holder of a bill of lading which specifically refers to a charter party and in unmistakable language incorporates the charter party's arbitration section can compel a party to the charter party to arbitrate a dispute which comes within the scope of the arbitration provision." *Imp. Exp. Steel Corp. v. Mississippi Valley Barge Line Co.,* 351 F.2d 503, 506 (2d Cir.1963) (citing *Son Shipping Co. v. De Fosse & Tanghe,* 199 F.2d 687, 688 (2d Cir.1952)); *see also Midland Tar Distillers, Inc. v. M/T· Lotos,* 362 F.Supp. 1311, 1313 (S.D.N.Y.1973) ("The bill of lading will be found to incorporate an arbitration clause contained in the charterparty and will be made subject to it when the bill clearly refers to the charterparty and the holder of the bill has either actual or constructive notice of the incorporation.").

Whether a bill of lading "specifically refers" to a charter party and unmistakably incorporates its arbitration provision is necessarily a fact driven determination. Generally, however, courts find that a bill of lading incorporates the charter party when the bill of lading refers to a charter party of a particular date or to the signatories to a charter party. *See Thyssen, Inc. v. M/V Markos N,* No. 97 Civ. 6181, 1999 U.S. Dist. LEXIS 12578, at *3 (S.D.N.Y. Aug. 16, 1999), *aff'd,* 310 F.3d 102 (2d Cir.2002); *Cont'l U.K. Ltd. v. Anagel Confidence Compania· Naviera,* 658 F.Supp. 809, 812–13 (S.D.N.Y.1987); *Lowry & Co. v. S.S. Le Moyne D'Iberville,* 253 F.Supp. 396, 398–99 (S.D.N.Y.1966) (Weinfeld, J.). Conversely, courts have rejected the concept of incorporation when the space provided in the bill of lading for the name and the date of the charter party is filled with a generic idiom or left blank. *See MacSteel Int'l USA Corp. v. M/V Jag Rani,* No. 02 Civ. 7436, 2003 WL 22241785, **3–4, 2003 U.S. Dist. LEXIS 17095, at *12–13 (S.D.N.Y. Sept. 29, 2003) (finding "As Per Relevant" insufficiently specific and unmistakable); *Associated Metals & Minerals Corp. v. M/V Arktis Sky,* No. 90 Civ. 4562, 1991 WL 51087, 1991 U.S. Dist. LEXIS 4194 (S.D.N.Y. Apr. 3, 1991); *Fairmont Shipping (H.K.), Ltd. v. Primary Indus. Corp.,* No. 86 Civ. 3668, 1988 WL 7805, 1988 U.S. Dist. LEXIS 428 (S.D.N.Y. Jan. 25, 1988).

There can be no question that the bill of lading here specifically refers to the Charter. It lists the parties to the Charter, the date of the Charter, and the place where the Charter was executed. Thus, the remaining issue is whether the bill of lading unmistakably provides for incorporation of the arbitration clause.[13] The Court finds that it does.

In *Son Shipping*, the seminal case in this Circuit concerning incorporation by reference, the incorporation provision was essentially identical to the provision at issue here.[14] In finding that the parties' intention to incorporate was unmistakable, the Court reasoned that "[t]he very breadth of the language of inclusion is emphasized by the specific exception and leaves no fair doubt as to the meaning of the parties." *Son Shipping*, 199 F.2d at 688 (citation omitted). Relying on *Son Shipping*, more recent decisions have found that similarly expansive language manifests an intent to incorporate. *See Cont'l Ins. Co. v. Polish Steamship Co.*, 346 F.3d 281, 283 (2d Cir.2003) (finding express incorporation where the bill of lading provided that "[a]ll terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, are herewith incorporated"); *Thyssen*, 1999 WL 619634, *1, 1999 U.S. Dist. LEXIS, at *3 (concluding incorporation was proper where the bill of lading stated that "all terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated").

In its only acknowledgment of missing language in the PT Cabot bill of lading, defendant argues that the bill does not contain the phrase "all the terms whatsoever of the said charter," which was critical to the analysis in *Son Shipping*. (Def. Rep. at 28.) Therefore, defendant alleges, the provision is not as clear as those found in *Son Shipping* and its progeny, and the parties' intent to incorporate the terms of the Charter is not "unmistakable." (*Id.*) First, defendant is not accurate in identifying the language missing from the bill of lading. The entire phrase, "all the terms whatsoever of the said charter," is not absent; only the first half of the phrase, "all the terms whatsoever," has been left out. Second, defendant offers no explanation for the omission. Indeed, the deliberate exclusion of this language would be probative of the parties' intentions with respect to incorporation, but counsel did not proffer that argument. Accordingly, defendant's position is meritless because, as discussed above, the Court is unwilling to attach any significance to the missing language without any guidance ·from the parties. *See* Part III(B) *supra*.

Furthermore, some ambiguity in the incorporation provision may be permitted when the party opposing a finding of incorporation is a signatory to the charter agreement referred to in the bill of lading. As Judge Weinfeld has explained:

> It is significant that it is a signatory to the charter party here that is seeking to

---

13. Previously, the Court observed that, even though certain language was missing from the incorporation provision of the bill of lading, it would consider the provision in its complete form in accordance with basic principles of contract interpretation. *See* Part III(B) *supra*.

14. The provision provided:
This shipment is carried under and pursuant to the terms of the charter dated Antwerp, June 29th, 1948 between Son Shipping Company and De Fosse & Tanghe, charterer, and all the terms whatsoever of the said charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.
*Son Shipping*, 199 F.2d at 688.

avoid the incorporation clause on the ground that it is too ambiguous. Generally, the cases that have found an incorporation clause to be too vague to identify the applicable charter party have involved an owner's or charterer's attempt to enforce an arbitration clause in a charter party against a consignee of the bill of lading ... That rationale [behind requiring specificity in the bill of lading] loses its force when the party resisting arbitration was a signatory to a charter party and had agreed that all bills of lading issued thereunder would incorporate the terms of the charter party.

*State Trading Corp. of India, Ltd. v. Grunstad Shipping Corp. (Belgium) N.V.*, 582 F.Supp. 1523, 1525 (S.D.N.Y.1984). As a signatory to the Charter, Oilmar was on notice that bills of lading could be issued and signed by the master of the vessel upon request pursuant to Section 20 of Part II of the Charter. More specifically, Section 20 provided that the bills of lading should follow the form of the attached model bill of lading, which expressly stated that all Charter terms are incorporated but for the rate and payment of freight provisions. Thus, defendant cannot now be heard to claim that it did not intend to incorporate the Charter's arbitration clause into the PT Cabot bill of lading.[15]

### D. The Arbitration Clause is Broad and PT Cabot's Claims Are Arbitrable

 After finding that the Charter's arbitration clause is incorporated by reference into the bill of lading, the Court must now decide whether PT Cabot's claims of negligence and breach of contract fall within the ambit of the clause. In making that determination, the Court should first characterize the clause as either narrow or broad. *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir.2001). The classification is significant because of the following rule that has emerged from past cases:

> Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Id.* (internal quotations and citations omitted).

 The arbitration clause at issue provides that "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter" are subject to arbitration. The Second Circuit's recent decision in *JLM Indus. v. Stolt–Nielsen SA* leaves little doubt that an arbitration clause so worded is properly characterized as "broad." 387 F.3d at 172 (2004); *see also Cont'l Ins.*, 2002 WL 530987, at *4 ("The quintessential broad arbitration clause applies, by its terms, to 'all disputes' arising under the charterparty.") (citations omitted); *Lowry & Co. v. S.S. LeMoyne D'Iberville*, 253 F.Supp. 396, 398 (S.D.N.Y. 1966) (Weinfeld, J.), *appeal dismissed*, 372 F.2d 123 (2d Cir.1967) ("[A]n agreement to arbitrate all 'disputes arising out of this charter' binds not only the original parties, but also all those who subsequently consent to be bound by its terms.").[16] There,

---

15. Because the Court finds incorporation by reference, it declines to address plaintiffs' additional arguments based in estoppel and waiver. (Pl. Mem. at 10–15.)

16. By comparison, a "narrow" clause is limited to "disputes between owners and charterers" and "applies only to disputes between *the particular parties identified in the clause.*" *Thyssen*, 1999 WL 619634, *4, 1999 U.S. Dist.

the court ruled that the arbitration clause, identical to the one here because the parties used the same standard charter party form, was sufficiently expansive that it extended to "collateral matters." *Id.* Thus, it may presumptively apply to more general allegations not premised upon the interpretation or enforcement of specific provisions of the Charter. *Id.* at 172.

 Defendant argues that the clause is narrow and limited to disputes between the two signatories because it provides that the owner and the charterer shall each appoint one arbitrator to the panel. (Def. Mem. at 15.) Defendant's argument misses the mark because language relating to the appointment of arbitrators does not affect the scope of the clause. *See Cont'l Ins.*, 2002 WL 530987, at *5 ("Courts have consistently held that such language governing the appointment of arbitrators, even if it specifically refers to owners and charterers, is insufficient to render the clause restrictive."); *Kaystone Chem., Inc. v. Bow Sun*, No. 88 Civ. 5859, 1989 WL 39498, *3, 1989 U.S. Dist. LEXIS 4384, at *10 (S.D.N.Y. Apr. 19, 1989) ("[T]he reference to owners and charterers appointing arbitrators does not indicate that the clause is limited to disputes between owners and charterers.").

 Although broad, the arbitration clause is limited to disputes that "arise out of" the Charter. In determining whether PT Cabot's claims arise out of the Charter, the Court must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." *JLM Indus.*, 387 F.3d at 173 (quotations and citation omitted). The primary factual allegations in the complaint assert that defendant breached its obligations under the contracts of carriage to safely transport PT Cabot's cargo to the Far East.

These allegations clearly relate to defendant's performance under the Charter and thus necessarily arise out of that agreement. Accordingly, the Court finds that PT Cabot's claims are arbitrable under the Charter's arbitration provision.

 Plaintiffs do not dispute that Oilmar's claims against ETL for freight and demurrage are arbitrable under the Charter. Since Oilmar's claims focus directly upon ETL's primary obligation under the agreement, payment of freight, it is clear that they too arise out of the Charter and are subject to arbitration.

E. *The Arbitration Clause Provides for One Panel to Resolve Disputes Arising under the Charter*

 Having established that both PT Cabot's and Oilmar's claims are arbitrable pursuant to the arbitration clause contained within the Charter and incorporated into the bill of lading, the Court must now determine whether the two sets of claims should be heard by a single arbitration panel or two different panels. Plaintiffs contend that one panel is required because the plain language of the arbitration clause provides that one panel should hear all claims arising out of the Charter and both sets of claims arise out of the Charter. However, defendant argues that two panels are necessary because the two sets of claims arise out of different provisions of different agreements.

As noted in Part III(A), *supra*, an arbitration agreement is the product of the parties' negotiations and thus, the parties' intentions must control. *See Mitsubishi Motors*, 473 U.S. at 626, 105 S.Ct. 3346. It bears repeating that the arbitration clause here, which is binding upon plaintiffs and defendant, states that "[a]ny and all differences and disputes of whatsoever nature

LEXIS 12578, at *13 (citing *Imp. Exp. Steel*

*Corp.*, 351 F.2d at 505–06).

arising out of th[e] Charter shall be put to arbitration ... before a board of three persons." Moreover, until the arbitrators close the hearings, "either party shall have the right ... to specify further disputes or differences under th[e] Charter for hearing and determination."

 Although the Charter and the bill of lading are distinct, albeit integrated, contracts and the two sets of claims may be founded upon different provisions of the Charter, there is but one arbitration clause. Based upon the Court's finding of incorporation by reference, the clause applies to both sets of claims. The parties agreed that all claims arising out of the Charter "of whatsoever nature" should be put before a panel of three arbitrators. Moreover, the clause expressly permits a party to the arbitration to submit additional claims to the panel before the conclusion of the hearing. Thus, when PT Cabot served Oilmar with an arbitration demand pursuant to the Charter's arbitration clause, Oilmar was on notice that the clause had been invoked and that all Charter-related claims should be submitted to the as yet to be formed panel. In its demand, PT Cabot identified that the claims at issue related to the May 2, 2003 explosion aboard the M.V. San Sebastian, specifically referenced the Charter's arbitration provision, and nominated an arbitrator for the panel.[17] Upon receiving the demand and after a fair reading of the arbitration clause, Oilmar should have recognized that its claims against ETL, though distinct from PT Cabot's claims,

also arose out of the Charter and therefore, should have been submitted for consideration by the same arbitration panel. Oilmar's attempt to initiate a second arbitration proceeding to review its particular Charter-related claims finds no support in the plain language of the Charter or in the relevant case law. Accordingly, the Court finds that Oilmar's claims against ETL and PT Cabot's claims against Oilmar should be submitted to a single arbitration panel.

## CONCLUSION

For the reasons stated above, defendant's motion to compel ETL to arbitrate before a second arbitration panel is DENIED. Further, plaintiffs' cross-motion to compel defendant to arbitrate before a single arbitration panel is GRANTED. The Court hereby orders the parties to submit both sets of claims to the panel that the parties have already assembled comprised of Messrs. Trowbridge, Rave, and Burke. The Court also orders that the current action is stayed and that, upon completion of arbitration, the parties shall return to this Court, if necessary, for the purpose of resolving any remaining unsettled claims.

**SO ORDERED.**

---

17. Although the arbitration clause provides that the "owner" and the "charterer" should each appoint an arbitrator, courts have found that the incorporation of the arbitration clause by a bill of lading permits the holder of the bill of lading to nominate an arbitrator, even if the clause refers only to the owner and charterer. *See Midland Tar,* 362 F.Supp. at 1315 ("The court finds ... a concomitant expansion in the provision for the selection of arbitrators. The arbitration provision ... should be read so as to afford each party to an arbitrable controversy the right to select an arbitrator."). Thus, in this case, it is appropriate that PT Cabot select one arbitrator, Oilmar select the second and, the two nominees select the third.