# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2622

_____

| | | |
|---|---|---|
| Whitebox Convertible Arbitrage Partners, L.P.; Whitebox Diversified Convertible Arbitrage Partners, L.P.; HFR RVA Combined Master Trust; Pandora Select Partners, L.P. | * * * * * * | |
| Appellants, | * * | |
| v. | * * * | Appeal from the United States District Court for the District of Minnesota. |
| IVAX Corporation, | * * | |
| Appellee. | * | |

_____

Submitted: January 12, 2007
Filed: April 6, 2007

_____

Before MELLOY, HANSEN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Appellants, a collection of partnerships and a unit trust (collectively referred to as "Whitebox"), filed suit against IVAX Corporation ("IVAX"), for breach of contract over IVAX's refusal to pay Whitebox a "make-whole" premium that Whitebox alleged it was owed under an indenture. The district court[1] determined that Whitebox was not

_____

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

entitled to the make-whole premium and dismissed the complaint, with prejudice, for failure to state a claim. We affirm.

## I. *Background*

In May 2005, pursuant to an indenture, IVAX issued $350 million of convertible notes that were to mature in 2025, and Whitebox acquired $52.4 million of the notes. Prior to their maturity, the notes could be converted into cash or shares of IVAX common stock, only under certain circumstances. The indenture for the notes specified conditions permitting conversion. One such condition was the merger of IVAX with another company. Section 4.1(b)(ii) of the indenture stated:

> if the Company [(IVAX)] becomes party to (A) a consolidation, merger or binding share exchange pursuant to which more than 50% of the Common Stock of the Company would be converted into Cash, securities or other property, or (B) a Fundamental Change, then a Holder may surrender the Securities for conversion *at any time on or before the date that is thirty (30) days after the Company announces that such transaction, event or Fundamental Change has occurred*.

(Emphasis added). In addition to providing that a merger was a condition permitting conversion, § 4.1(b)(ii) also established that the notes could not be surrendered for conversion, under this circumstance, until after IVAX announced that the merger had occurred. *Id.*

In general, the indenture provided that notes properly surrendered for conversion following a merger were convertible at a set conversion rate. But, if a merger occurred before May 15, 2012, § 4.13(a) provided that noteholders were entitled to an increased conversion rate—a "make-whole premium"—if they surrendered their notes "for conversion *at any time on or before the 30th day after* the

date" IVAX announced that a merger or other fundamental change had occurred. (Emphasis added).[2]

On July 25, 2005, IVAX announced that it *would* merge—not that it had merged—with Teva Pharmaceutical Industries Ltd ("Teva"). The pending merger, when it occurred, would provide noteholders with an opportunity to surrender their notes for conversion. Because the merger was to occur before May 15, 2012, the noteholders would also be entitled to the make-whole premium, if they surrendered their notes for conversion "at any time on or before the 30th day after the date" IVAX announced that the merger had occurred. *Id*.

As news of the pending merger spread, the market price of IVAX's common stock climbed from approximately $26.00 per share to over $30.00 per share. As a result, the parity value of the notes also increased.[3] But, because the indenture only permitted noteholders to surrender their notes for conversion after a merger (or other

_____

[2]In general, after a conversion-permitting circumstance occurred, each $1,000 note was convertible into 44.0009 shares of IVAX common stock, at a set rate of $26.00 per share. Thus, each $1,000 convertible note had a conversion value of $1,144.02 (44.0009 [shares per note] x $26.00 [rate per share] = 1,144.02). But, if the make-whole premium applied, the conversion value per note increased, as each note was convertible into a higher number of shares, depending on when the merger or other fundamental change occurred and the stock market price at that time. The make-whole premium in this case, would have increased the conversion rate per $1,000 note by approximately 3.22 shares, resulting in each $1,000 convertible note having a conversion value of $1,227.74 (47.2209 x $26.00 = 1,227.74).

[3]As of July 25, 2005, the date that the pending merger was announced, the notes had a market parity value of approximately $1,161 each (44.0009 [shares per note] x $26.40 [market price per IVAX share] = $1,161). By December 30, 2005, the market price of IVAX shares had increased to $31.33, so that market parity for each note was approximately $1,379 (44.0009 x $31.33 = $1,379). From the date the pending merger was announced, and thereafter, the notes traded above par and were always "in the money."

fundamental change) had occurred, and then only converted the notes at a set stock price of $26.00 per share of common stock received, the noteholders were unable to take advantage of the increased market value of the notes.[4]

To allow noteholders the ability to capitalize on the market conditions, IVAX, with the permission of Teva, issued a statement to noteholders on November 23, 2005, announcing that it would voluntarily permit the noteholders to convert their notes into IVAX shares at market price, commencing on December 1, 2005, even though the merger had not yet occurred. The statement informed the noteholders that:

> In order to permit conversion of all IVAX outstanding "in the money" convertible notes in advance of the closing of the merger with Teva . . . the [notes] . . . will, effective as of December 1, 2005, become convertible at the option of the holders, as the contingent conversion triggers for the [Notes] have been waived by IVAX as of such date.

This statement changed the requirements for obtaining the make-whole premium, and the statement noted that "Teva ha[d] not made a decision whether to pay the 'make-whole' premium . . . ." *Id.* The noteholders were not required to convert their notes pre-merger (or post-merger for that matter), and the statement explicitly stated that the "announcement [did] not constitute a recommendation to the holders of IVAX notes as to which action, if any, they may choose to take." *Id.*

Following the announcement, Whitebox (and all other IVAX noteholders) converted their notes in December 2005—prior to the closing of the merger—taking advantage of the increased market value of IVAX stock.[5] On January 26, 2006, the

---

[4]The make-whole premium only increased the number of IVAX stock shares received per $1,000 note converted. It did not affect the $26.00 rate paid per share.

[5]Whitebox admittedly received much more consideration for its notes by converting them at the market rate prior to the merger, than it would have received had it converted post-merger and received the make-whole premium.

IVAX/Teva merger closed, and a press release announcing the closing of the merger was issued the same day.

On January 3, 2006—before the merger had closed—Whitebox filed the instant suit for breach of contract, seeking declaratory relief. In the complaint, Whitebox sought a declaration that it was entitled to the make-whole premium even though it admittedly converted its notes prior to the effective date of the merger. The district court dismissed Whitebox's complaint for failure to state a claim, concluding that § 4.13(a) contemplated a "30-day period" for eligibility for the make-whole premium, and that Whitebox was not entitled to the premium because it had converted its notes before the 30-day period began.

## II. *Discussion*

We review de novo the district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), taking all facts as alleged in the complaint as true. *Ripplin Shoals Land Co., LLC v. United States Army Corps of Eng'rs*, 440 F.3d 1038, 1042 (8th Cir. 2006). Under § 4.13(a) of the indenture, noteholders that surrendered their notes for conversion "at any time on or before the 30th day after the date the Company announces that the [merger] . . . ha[d] occurred" were entitled to receive the make-whole premium. Whether Whitebox is entitled to the make-whole premium turns on the interpretation of § 4.13(a)'s phrase "at any time on or before the 30th day after."

IVAX announced that the merger occurred on January 26, 2006, making February 25, 2006, the 30th day after the date of the announcement. Whitebox contends that the phrase "at any time on or before the 30th day after" the date IVAX announced the merger had occurred means, "*at any time* on or *before* the 30th day after" the date the closed-merger announcement was made. Thus, under Whitebox's interpretation, any noteholder who surrendered its notes for conversion on or before February 25, 2006, is entitled to the premium. Because Whitebox surrendered its notes

for conversion in December 2005—before February 25, 2006—it claims entitlement to the premium.

IVAX, on the other hand, contends that "at any time on or before the 30th day after" the announcement that the merger occurred, means at any time from the date of the announcement through, and including, the 30th day following the announcement. Thus, according to IVAX, the disputed phrase only required payment of the make-whole premium if a noteholder surrendered its notes during the 30-day period from the date of the merger-occurrence announcement through, and including, the 30th day after the announcement. Because Whitebox surrendered its notes before the merger occurred, and thus before IVAX announced that the merger had occurred, IVAX maintains that Whitebox was not entitled to the make-whole premium.

The indenture provides, and all parties agree, that New York law governs the interpretation of the indenture. Under New York law, when interpreting an indenture or contract, the words and phrases used by the parties must be given their plain meanings. *Brooke Group v. JCH Syndicate*, 663 N.E.2d 635 (N.Y. 1996). If the contract is ambiguous, it should be resolved against the party who prepared or presented the document. *151 West Assoc. v. Printsiples Fabric Corp.*, 460 N.E.2d 1344 (N.Y. 1984). However, the contract should not be interpreted phrase by phrase, but must be considered in its entirety, with all parts of it reconciled, if possible, in order to avoid an inconsistency. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992).

Examining the indenture in its entirety, the disputed phrase in § 4.13(a) clearly refers to a 30-day period beginning on the day that the announcement was made that the merger had occurred. Interpreting the disputed phrase in the manner proposed by Whitebox would render portions of §§ 4.13(b) and (c) without meaning, which we decline to do. *Laba v. Carey*, 277 N.E.2d 641 (N.Y. 1971) (stating that the court should not adopt an interpretation which would operate to leave a provision of a contract without force and effect); *Cruden*, 957 F.2d at 976.

Section 4.13(b) includes a table setting forth the make-whole premium to be added to the conversion rate "applicable to the [notes] surrendered for conversion *during the 30-day period described in paragraph (a) of this Section 4.13*." (Emphasis added). Unless the phrase in question—"at any time on or before the 30th day after the date the Company announces that the [merger] . . . has occurred"—is a 30-day period, there is no "30-day period described in" § 4.13(a). Therefore, if the phrase in question is not given the 30-day period interpretation, the above quoted reference to § 4.13(a) in § 4.13(b) would be without meaning. Additionally, we note that § 4.13(a) expressly references § 4.13(b) ("[T]he Conversion Rate then in effect will . . . increase, as described in paragraph (b) of this Section 4.13.").

In addition, § 4.13(c) also references a "30-day period." This section, which describes the effect of a "Public Acquirer Fundamental Change" as compared to a "Make-Whole Fundamental Change," states, in part, that:

> If the Company elects to change the conversion right pursuant to this paragraph (c), the change in the conversion right will apply to all Holders from and after the Effective Date of the Public Acquirer Fundamental Change, and not just those Holders, if any, that convert their Securities *during the 30-day period* after the Company announces the Public Acquirer Fundamental Change.

(Emphasis added).

Like § 4.13(b), § 4.13(c)'s reference to a "30-day period" is illogical unless the disputed phrase in § 4.13(a) is interpreted to mean the 30-day period from the date that IVAX announced that the merger (or other fundamental change) had occurred through, and including, 30 days thereafter, because there is no other 30-day period for the reference to apply to. Moreover, as with § 4.13(b), § 4.13(a) also expressly references § 4.13(c) ("subject to the Company's rights described under paragraph (c) of this Section 4.13").

If the phrase "at any time on or before 30 days after" is given the interpretation suggested by Whitebox, then §§ 4.13(b) and (c) would contain empty references to a 30-day period. But, when the phrase is interpreted as meaning a 30-day period from the date of the announcement that the merger occurred, through, and including, the 30th day thereafter, §§ 4.13(a),(b), and (c) read harmoniously, without any empty references. *See Energy Transport, Ltd. v. M.V. San Sebastian*, 348 F. Supp. 2d 186, 203 (S.D.N.Y. 2004) ("[C]ourts should avoid an interpretation that makes a contractual provision superfluous."); *Laba*, 277 N.E.2d at 644; *Cruden*, 957 F.2d at 976.

Reading the indenture in its entirety, we find that the phrase at issue unambiguously refers to the 30-day period beginning on the date that IVAX announced the merger occurred. This result is further supported by § 4.1(b)(ii), quoted above, which used a phrase almost identical to the disputed phrase—"at any time on or before the date that is thirty (30) days after"—to state that notes could not be converted until *after* a merger.[6]

## III. *Conclusion*

As the indenture only obligated IVAX to provide noteholders the make-whole premium if they surrendered their notes for conversion "on or before the 30th day after the date" that IVAX announced that the merger occurred, and Whitebox admittedly converted its notes pre-merger, IVAX was not obligated to pay Whitebox the make-whole premium. Accordingly, we affirm the judgment of the district court.

———————————————————

---

[6]Until IVAX and Teva decided to allow the pre-merger conversion announced through the November 23, 2005 press release, it is undisputed that conversions on account of a merger could not take place until after the merger had occurred.