The **BANK OF NEW YORK MELLON**, solely in its capacity as Trustee under the Indenture pursuant to which the 11.00%/11.75% Senior Toggle Notes Due 2014 were issued, and High River Limited Partnership, Plaintiffs,

v.

**REALOGY CORPORATION**, Defendant.

C.A. No. 4200–VCL.

Court of Chancery of Delaware.

Submitted: Dec. 15, 2008.

Decided: Dec. 18, 2008.

Stephen E. Jenkins, Esquire, Richard I.G. Jones, Esquire, Andrew D. Cordo, Esquire, Ashby & Geddes, P.A., Wilmington, DE; Sigmund S. Wissner–Gross, Esquire, May Orenstein, Esquire, Brown Rudnick, LLP, New York City; James Gadsden, Esquire, Carter Ledyard & Milburn, LLP, New York City, for the Bank of New York Mellon, solely in its capacity as Trustee under the Indenture pursuant to which 11.00%/11.75% Senior Toggle Notes Due 2014 were issued.

Thomas J. Allingham II, Esquire, Paul J. Lockwood, Esquire, Skadden Arps Slate Meagher & Flom, LLP, Wilmington, DE; George A. Zimmerman, Esquire, Lauren

E. Aguiar, Esquire, Skadden Arps Slate Meagher & Flom, LLP, New York City, for Realogy Corporation.

## OPINION

LAMB, Vice Chancellor.

All of a corporation's unsecured indebtedness is trading at a deep discount to face value. The corporate borrower proposes to take advantage of the substantial arbitrage opportunity presented by offering to refinance a large amount of the unsecured indebtedness with a substantially smaller amount of a senior secured term loan. The corporation means to do this by offering holders of the unsecured indebtedness the opportunity to exchange notes for a participation in a new term loan facility secured by a second lien on its assets. If successful, this gambit will reduce both current cash interest payments and future principal obligations.

Holders of a class of unsecured notes that permit the corporation to make interest payments either in kind or in cash (the "Toggle Notes") object to the terms of the exchange offer because it discriminates against them in favor of holders of other classes of unsecured notes that pay interest in cash. These holders have enlisted the trustee under the indenture governing the Toggle Notes to sue the corporation for a declaration to the effect that the proposed transaction would violate the terms of that indenture.

The trustee and the corporate issuer have both moved for summary judgment. Both argue that the relevant contracts unambiguously support their interpretation. Both urge the court to enter a declaratory judgment in their favor. In the end, the issue boils down to whether or not the proposed lien securing the new term loan is a "Permitted Lien" within the meaning of the Toggle Note indenture. That question, in turn, depends on whether the proposed borrowing satisfies the definition of Permitted Refinancing Indebtedness found in the bank credit agreement incorporated by reference into that indenture. Applying New York law of contract interpretation, the court concludes that it does not. Therefore, a declaratory judgment will issue in favor of the trustee.

## I.

### A. The Parties

Plaintiff The Bank of New York Mellon (the "Trustee") is a New York banking corporation and the indenture trustee for the 11.00%/11.75% Senior Toggle Notes due 2014 (the "Senior Toggle Notes") issued by Realogy.

Plaintiff High River Limited Partnership is a Delaware limited partnership with its principal place of business in New York City. High River is controlled by investor Carl Icahn, and purports to be a beneficial owner of an unspecified quantity of Senior Toggle Notes.

Defendant Realogy Corporation is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Realogy is a provider of real estate and relocation services, and includes such well-known brands as Century 21, Coldwell Banker, and Sotheby's International Realty. Realogy is the issuer of the Senior Toggle Notes.

### B. Facts

Realogy is one of the four companies that resulted from the break-up of Cendant Corporation in 2006. Realogy was a publicly traded corporation from the time it was spun-off by Cendant in 2006 until it was taken private by an affiliate of Apollo Management, L.P. (collectively with its affiliates, "Apollo") in April 2007, during the height of the private equity boom.

In order to provide the large amount of debt financing necessary to complete Apollo's acquisition of Realogy, Realogy issued a number of debt instruments. Seniormost in its capital structure is a senior secured facility consisting of a $3.17 billion term loan facility ("Term B Loans") and a $750 million revolving loan and letter of credit facility, both pursuant to the Credit Agreement dated as of April 10, 2007 (the "Credit Agreement"), among, *inter alia,* Realogy, JPMorgan Chase Bank, N.A. ("JPM") as administrative agent for the lenders, and the various lenders to whom JPM syndicated the loans (the "Lenders"). The Credit Agreement obligations are secured by a first lien on substantially all of the assets of Realogy. In addition to the Term B and revolving loan facilities, the Credit Agreement also provides for an "accordion" feature which allows Realogy to issue up to $650 million in additional term loans (the "Other Term Loans").[1] These Other Term Loans may be issued on either the same terms as the Term B Loans under the Credit Agreement or on such other alternative terms as JPM should deem satisfactory.

Concurrently with and in addition to the Credit Agreement indebtedness, Realogy issued several classes of notes. Senior among these note issues are the $1.7 billion principal value of 10.50% Senior Notes due 2014 (the "Senior Cash Notes") and the $582 million[2] principal value of the aforementioned Senior Toggle Notes (collectively the "Senior Notes"). The Senior Cash Notes require cash payment of interest on a semi-annual basis. The Senior Toggle Notes allow the semi-annual interest payments to be paid-in-kind ("PIK") with additional Senior Toggle Notes, effectively allowing Realogy the flexibility to capitalize a portion of its interest expenses if it so chooses. The Senior Notes rank *pari passu* to the Credit Agreement indebtedness but are unsecured. Realogy also issued $875 million principal value of 12.375% Senior Subordinated Notes due 2015 (the "Senior Subordinated Notes"), which are subordinated in right of payment to the Senior Notes and the Credit Agreement indebtedness. Like the Senior Cash Notes, the Senior Subordinated Notes require semi-annual cash payment of interest and are unsecured. Both the Credit Agreement and the trust indentures governing the various notes contain negative covenants regarding the use of funds for the early redemption or refinancing of indebtedness.

Like the rest of the residential real estate industry, Realogy has fallen on hard times since the closing of its LBO. As evidence of the market's evaluation of Realogy's diminished prospects to pay back its debt, the Senior Cash Notes presently trade at just below 18 cents on the dollar, the Senior Toggle Notes at approximately 13 cents on the dollar, and the Senior Subordinated Notes at just below 12 cents on the dollar. All of the notes are presently rated C by the various debt rating agencies.

On November 13, 2008, Realogy issued a press release announcing the terms and conditions of a proposed debt refinancing. According to the terms of the offer (as

---

**1.** Unlike the Term B and revolving loans, which the syndicated lenders are committed to fund under the Credit Agreement, the Other Term Loans place no obligations to fund on the syndicated lenders. Instead, the Credit Agreement anticipates soliciting new lenders to participate in the Other Term Loans.

**2.** Realogy initially issued $550 million of Senior Toggle Notes, but elected to capitalize its October 2008 interest payment. Realogy Corp., Current Report (Form 8–K) (Dec. 2, 2008).

finally amended), eligible noteholders [3] are invited to participate as lenders under a new $500 million term lending facility. The term lending facility would consist of Term C and Term D Loans under the Other Term Loans accordion feature of the Credit Agreement, and would be secured by a second lien on substantially all of the assets of Realogy. Instead of funding these term loans with cash, the participating noteholders would fund their obligations under the new term loans with the delivery of existing notes, with priority given to commitments funded with certain classes of notes. In order of priority, for each $100,000 in term loan commitment, holders of:

(1) Senior Subordinated Notes would be required to deliver $277,477.48 [4] in principal value of Senior Subordinated Notes, up to an aggregate value of all term loan commitments funded by Senior Subordinated Notes of $125 million;

(2) Senior Cash Notes would be required to deliver $198,709.68 [5] in principal value of Senior Cash Notes, up to an aggregate value of all term loan commitments funded by Senior Cash Notes equal to the difference between $500 million and the aggregate value of term loan commitments accepted from holders of the Senior Subordinated Notes;

(3) Senior Toggle Notes would be required to deliver $212,030.08 [6] in principal value of Senior Toggle Notes, up to an aggregate value of the lesser of (a) $175 million and (b) the difference between $500 million and the aggregate value of term loan commitments accepted from holders of the Senior Subordinated Notes and Senior Cash Notes combined.[7]

Thus, the new term loans would be *pari passu* to the existing indebtedness under the Credit Agreement as well as the Senior Notes. Unlike the Senior Notes however, the new term loans would be secured debt. This security would give the holders of the new term loans an effectively higher priority in any potential bankruptcy proceeding than any of the Senior Notes or the Senior Subordinated Notes.

The invitations to participate will expire, unless extended by Realogy, at midnight New York City time on December 19,

---

**3.** Because of the nature of the refinancing indebtedness, participants must be eligible qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933.

**4.** Implying a principal value exchange rate of approximately 36 cents on the dollar.

**5.** Implying a principal value exchange rate of approximately 50 cents on the dollar.

**6.** Implying a principal value exchange rate of approximately 47 cents on the dollar.

**7.** *See* Realogy Corp., Current Report (Form 8–K), at 2 (Dec. 8, 2008); Realogy Confidential Information Memorandum for Up To $500,000,000 Second Lien Incremental Term Loans. While Senior Subordinated Notes and Senior Cash Notes are invited to make commitments for Term C Loans, the Senior Toggle Notes are instead invited to make commitments for Term D Loans. Unlike the Term C Loans, Term D Loans have a PIK feature that preserves Realogy's ability to capitalize interest under the Senior Toggle Notes. It is anticipated that commitments funded by the Senior Subordinated Notes and the Senior Cash Notes will exhaust the $500 million maximum commitment. Thus, although the Toggle Noteholders are nominally invited to participate in the transaction, it is possible that no commitments funded by Senior Toggle Notes will be accepted by Realogy. The plaintiff also notes that Apollo owns approximately $69 million in Senior Subordinated Notes, and has indicated its intention to participate in the exchange to the maximum extent possible.

2008.[8] Realogy expects the transaction to close on December 23, 2008.[9]

On November 24, 2008, counsel for the majority of the Senior Toggle Noteholders demanded in writing that Realogy confirm that it would terminate the proposed exchange transaction, citing *inter alia*, allegations of certain covenant breaches of the indenture governing the Senior Toggle Notes (the "Indenture").[10] Realogy replied on November 25, 2008 that it intended to proceed with the transaction. Later that day, Realogy filed a Current Report with the Securities and Exchange Commission (the "SEC") confirming that intention and its rejection of the noteholders' position.[11]

On November 26, 2008, the Trustee similarly demanded that Realogy cure certain alleged anticipated failures to comply with the terms of the Indenture and that Realogy immediately terminate the proposed exchange transaction. Included in the Trustee's grounds for this demand was the claim that the exchange transaction would constitute a breach of Section 4.12 of the Indenture.

### C. *Procedural History*

The Trustee and High River filed the complaint against Realogy in this court on November 26, 2008. Counts I and II, brought by the Trustee, seek declaratory judgment that consummation of the transaction without the granting of certain liens to the Senior Toggle Notes would consti-

tute a breach of Section 4.12 of the Indenture. Counts III and IV, brought by High River, involve allegations that the exchange transaction if consummated would constitute a fraudulent transfer on the part of Realogy, and are not presently before the court.

On December 1, 2008, the plaintiffs filed a motion to expedite. During a telephonic conference that afternoon, the parties informed the court that the plaintiffs' motion to expedite was unopposed and proposed that cross-motions for summary judgment on Counts I and II be heard in an expedited manner. The parties also agreed to stay Counts III and IV.[12] Realogy timely filed its answer to Counts I and II of the complaint on December 8, 2008. The parties submitted opening briefs on their cross-motions for summary judgment on December 9, 2008 and answering briefs on December 14, 2008. A hearing was held on December 15, 2008.

### II.

The legal standard for cross-motions for summary judgment is well settled. To prevail, each moving party must show that there is "no genuine issue as to any material fact" and that each party is "entitled to judgment as a matter of law."[13] Where the parties have filed cross-motions for summary judgment and neither party has argued that there is an issue of material fact, the motions are deemed to be a stipulation for a decision based on the submit-

---

8. *See* Realogy Corp., Current Report (Form 8–K), at 2 (Dec. 8, 2008).

9. *Id.*

10. Realogy Corp., Indenture for 11.00%/11.75% Senior Toggle Notes due 2014 (Form S–4, Ex. 4.5) (Dec. 18, 2007).

11. Realogy Corp., Current Report (Form 8–K) (Nov. 25, 2008).

12. Because High River lacks standing on Counts I and II, it has not appeared via counsel with respect to the present cross-motions for summary judgment.

13. Ct. Ch. R. 56(c); *see also Acro Extrusion Corp. v. Cunningham,* 810 A.2d 345, 347 (Del. 2002); *Williams v. Geier,* 671 A.2d 1368, 1375 (Del.1996).

ted record.[14] However, even when presented with cross-motions for summary judgment, a court must deny summary judgment if a material factual dispute exists.[15]

█ In deciding a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party.[16] The moving party bears the burden of demonstrating that there is no material question of fact.[17] "A party opposing summary judgment, however, may not merely deny the factual allegations adduced by the movant."[18] "If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight."[19] Summary judgment will not be granted when the record reasonably indicates that a material fact is in dispute or "if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[20]

### III.

The Trustee makes a number of arguments as to why the proposed exchange transaction violates the Indenture. All of the Trustee's arguments, however, boil down to variants of the same proposition: the proposed transaction violates the Credit Agreement. Section 4.12 of the Indenture restricts Realogy's right to grant or suffer the existence of liens.[21] To the extent that liens are created in favor of indebtedness which is *pari passu* to the Senior Toggle Notes, the Senior Toggle Notes must be granted equal and ratable liens. To the extent that liens are created in favor of indebtedness which is subordinated to the Senior Toggle Notes, the Senior Toggle Notes must be granted liens senior to the liens supporting the subordinated indebtedness. Neither of these restrictions apply, however, if the created liens qualify as Permitted Liens under the Indenture. The definition of Permitted Liens in the Indenture, under subsection (6)(B), includes liens created pursuant to

---

14. Ct. Ch. R. 56(h).

15. *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 166–67 (Del.Ch.2003) (citing *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del.1988)).

16. *Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del.Ch.1979) (citing *Judah v. Delaware Trust Co.*, 378 A.2d 624, 632 (Del.1977)).

17. *Id.*

18. *Tanzer*, 402 A.2d at 385.

19. *Id.*

20. *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962).

21. Section 4.12 of the Indenture reads:

The Issuer shall not, and shall not permit any of the Restricted Subsidiaries to, direct-

ly or indirectly, create, Incur or suffer to exist any Lien on any asset or property of the Issuer or such Restricted Subsidiary securing Indebtedness unless the Notes or, in respect of Liens on any asset or property of a Restricted Subsidiary, any Note Guarantee of such Restricted Subsidiary, are equally and ratably secured with (or on a senior basis to, in the case of obligations subordinated in right of payment to the Notes or the Note Guarantees, as the case may be) the obligations so secured until such time as such obligations are no longer secured by a Lien. The preceding sentence shall not require the Issuer or any Restricted Subsidiary to secure the Notes if the Lien consists of a Permitted Lien. Any Lien that is granted to secure the Notes or such Note Guarantee under this Section 4.12 shall be automatically released and discharged at the same time as the release of the Lien that gave rise to the obligation to secure the Notes or such Note Guarantee under Section 4.12.

the Credit Agreement.[22] This much is undisputed between the parties.

The dispute here is whether or not the proposed exchange transaction is permitted by the Credit Agreement. If it is not, the Trustee argues, it cannot be incurred "under the Credit Agreement." [23] If it cannot be incurred "under the Credit Agreement," it cannot be a Permitted Lien.[24] If it is not a Permitted Lien, then failing to provide the appropriate equal and ratable or senior liens to the Senior Toggle Notes is a breach of Section 4.12. The Trustee asserts that the proposed exchange transaction is not permitted under the Credit Agreement, and therefore the transaction, if consummated, would result in a breach of Section 4.12 of the Indenture. Realogy counters that in fact the transaction is permitted under the Credit Agreement, and therefore the liens securing the Second Lien Term Loans constitute Permitted Liens under the Indenture. As a result, Realogy argues, no breach of Section 4.12 of the Indenture will occur. Because the Credit Agreement is simply a contract between Realogy, the Lenders, and JPM as administrative agent, this is simply an exercise in contract interpretation.[25]

 Both the Credit Agreement and the Indenture are to be construed under New York law, pursuant to choice of law provisions contained in each document.[26] "Under New York law, as in Delaware, the construction and interpretation of an unambiguous written contract is an issue of law within the province of the court." [27] "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." [28]

---

**22.** The definition of Permitted Lien under the Indenture reads, in pertinent part:

"Permitted Lien" means, with respect to any Person:

(6) (B) Liens securing an aggregate principal amount of Senior Pari Passu Indebtedness not to exceed the aggregate amount of Senior Pari Passu Indebtedness permitted to be Incurred pursuant to clauses (1) and (24) of Section 4.09(b).

Section 4.09 of the Indenture reads, in pertinent part:

(a) (1) The Issuer shall not, and shall not permit any of the Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock....

(b) The limitations set forth in Section 4.09(a) hereof shall not apply to:

(1) the Incurrence by the Issuer or the Restricted Subsidiaries of Indebtedness under the Credit Agreement and the issuance and creation of letters of credit and bankers' acceptances thereunder (with letters of credit and bankers' acceptances being deemed to have a principal amount equal to the face amount thereof) up to an aggregate principal amount of $3,250.0 million at any one time outstanding, less all principal repayments of Indebtedness Incurred under this clause (1) with the Net Proceeds of Asset Sales utilized in accordance with Section 4.10(b)(1)(a) that permanently reduces the commitments thereunder....

**23.** Indenture § 4.09(b)(1).

**24.** *See* Indenture § 1.01, at 27; Indenture § 4.09(b)(1). This assumes, as both parties agree, that none of the other exceptions under the definition of Permitted Liens in the Indenture could be applied to the transaction.

**25.** *Cf. Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir.1982) (stating that under New York law, "[i]nterpretation of indenture provisions is a matter of basic contract law").

**26.** *See* Credit Agreement § 10.07; Indenture § 12.08.

**27.** *Law Debenture Trust Co. v. Petrohawk Energy Corp.*, 2007 WL 2248150, at *5 (Del.Ch.), aff'd mem., 947 A.2d 1121 (Del.2008); *see also K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996).

**28.** *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir.1998).

"Contractual language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." [29] "Contract language is unambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' "[30] "Where the [contract's] language is free from ambiguity, its meaning may be determined as a matter of law on the basis of the writing alone without resort to extrinsic evidence." [31] Thus, summary judgment is an appropriate process for the enforcement of unambiguous contracts because there are no material disputes of fact for the court to resolve. [32]

■■■ "In interpreting contract language, New York contract law instructs courts ordinarily to give the words and phrases employed their plain and commonly-accepted meanings." [33]

The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable. In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. The parties having agreed upon their own terms and conditions, "the courts cannot change them and must not permit them to be violated or disregarded." [34]

The parties agree that the Credit Agreement is unambiguous, although they disagree in certain key aspects as to its meaning. The Trustee, to whom the burden of proving that the proposed transaction is not permitted under the Credit Agreement falls, [35] essentially advances two arguments. [36] First, the Trustee asserts, because the proposed Second Lien Term Loans are to be funded with tendered notes and not with cash, the Second Lien Term Loans cannot qualify as Loans under the Credit Agreement. Second, even if the Second Lien Term Loans are Loans under the Credit Agreement, those Loans would violate the negative covenants contained in Section 6.09 of the Credit Agreement. Each of these positions will be taken in turn.

### IV.

■■■ The Trustee urges that the Second Lien Term Loans cannot be Loans

**29.** *First Lincoln Holdings, Inc. v. Equitable Life Assurance Society,* 164 F.Supp.2d 383, 393 (S.D.N.Y.2001) (citing *U.S. Trust Co. of New York v. Jenner,* 168 F.3d 630, 632 (2d Cir.1999)).

**30.** *Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990) (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)).

**31.** *Master–Built Constr. Co. v. Thorne,* 22 A.D.3d 535, 802 N.Y.S.2d 713, 714 (2005).

**32.** *See Reardon v. Exch. Furniture Store,* 188 A. 704, 707 (Del.1936).

**33.** *Petrohawk,* 2007 WL 2248150, at *6.

**34.** *RJR Nabisco, Inc.,* 906 F.2d at 889 (some internal citations and quotations omitted) (quoting *Whiteside v. North American Accident Ins. Co.,* 200 N.Y. 320, 93 N.E. 948, 950 (N.Y, 1911)).

**35.** *Cf. In re Loral Space and Commc'ns Inc. Consol. Litig.,* 2008 WL 4293781, at *35 (Del. Ch.) ("Indentures are to be read strictly and to the extent they do not expressly restrict the rights of the issuer, the issuer is left with the freedom to act, subject only to the boundaries of other positive law.").

**36.** *See* Pls.' Opening Br. § II; Pls.' Answering Br. § I.

under the Credit Agreement because they are not funded in cash. In support of its position, the Trustee makes two basic arguments: (1) the plain meaning of "loan" does not encompass non-cash funded transactions; (2) non-cash funded loans are in any event not permitted by the terms of the Credit Agreement.

## A. Does "Loan" Necessarily Imply Cash Funding?

Realogy purports that the new Second Lien Term Loans will be created as Other Term Loans pursuant to Section 2.20 of the Credit Agreement.[37] "Other Term Loans" is defined in Section 2.20 as "term loans with pricing and/or amortization terms different from the Term B Loans." The Trustee argues that the plain meaning of the word "loans" does not permit for the funding of borrowings other than in cash. Thus, because the borrowings will not be funded with cash, they cannot be Other Term Loans, and therefore cannot be authorized under Section 2.20.

The court finds this argument uncompelling. The fundamental feature of a loan is the advancement of some valuable prop-erty in exchange for a promise to repay that advancement.[38] Generally the repayment is required to be in cash, even if the initial value given is not. There are many commercial examples of loans which are not funded in cash but which are repaid in cash, such as traditional vendor and seller financing agreements.[39] The fact that loans under credit agreements are typically funded in cash does not mean that the word "loan" cannot even in that context encompass borrowings funded otherwise. Moreover, such hyper-technical arguments seem out of place when made by a non-party to the contract being interpreted.

## B. Does The Credit Agreement Require Loans To Be Funded With Cash?

The Trustee relies on a number of provisions, taken in the aggregate, in an attempt to prove that the Credit Agreement does not permit the creation of loans funded other than with cash. These arguments fundamentally fall into two categories: (1) arguments based on the use of loan denominations in terms of amounts of currency; and (2) arguments based on various procedural and ministerial provisions.

**37.** Section 2.20 of the Credit Agreement reads, in pertinent part:

> (a) The Borrower may, by written notice to the Administrative Agent from time to time, request Incremental Term Loan Commitments ..., in an amount not to exceed the Incremental Amount from one or more Incremental Term Lenders ... (which may include any existing Lender) willing to provide such Incremental Term Loans ..., in their own discretion.... Such notice shall set forth ... (iv) in the case of Incremental Term Loan Commitments, whether such Incremental Term Loan Commitments are to be Term Loan Commitments or commitments to make term loans with pricing and/or amortization terms different from the Term B Loans ("Other Term Loans").

**38.** See In re Renshaw, 222 F.3d 82, 88 (2d Cir.2000) (interpreting the term loan "accord-ing to its settled meaning under the common law"). Renshaw states, "[t]o constitute a loan there must be (i) a contract, whereby (ii) one party transfers a defined quantity of money, goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date." Id.

**39.** The court also notes the existence of "consolidation loans" for student loan indebtedness. These consolidation loans are often offered by the same lender that made the original loans to the student borrower. Thus a lender funds the new consolidation loan by tendering all of the borrower's earlier incurred promissory notes. The lender then takes back from the borrower a new promissory note evidencing the aggregate indebtedness. This new promissory note often contains materially different terms than the original notes.

### 1. *Arguments Based On Currency Terms*

The Trustee points out that the Credit Agreement frequently speaks about loans in terms of quantities of currency, and cites to these provisions as evidence that only cash loans are permitted. First, the Trustee points out, Section 2.01(d) requires lenders to make Incremental Term Loans (which includes Other Term Loans) "in an aggregate principal amount not to exceed its Incremental Term Loan Commitment." "Principal," the Trustee says, refers to the amount of money that Realogy will receive in the borrowing. The Trustee then points to Section 2.20(a)(ii) as evidence that the Incremental Term Loan Commitment is denominated in dollars.[40] Thus, the Trustee says, "[n]one of these word choices makes any sense except with reference to loans funded by cash."[41]

The court is unconvinced. The use of the term "principal," denominated in dollars, still has an obvious meaning with respect to the Second Lien Term Loans. It is the amount that Realogy will be required to repay to the Incremental Term Lenders upon maturation of the Second Lien Term Loans. This is no different than any other term loan, whether originally funded in cash or other valuable consideration. Similarly, the reasoning for denominating the Incremental Term Loan Commitments in dollars is applicable to term loans regardless of their means of funding. The Incremental Term Loan Commitment of an Incremental Term Lender indicates the maximum value he will be required to deliver under his commitment. He may be asked to fund in cash, or in notes, or otherwise. But he can be assured that he will not be asked to deliver consideration of value any greater than the dollar value of his Incremental Term Loan Commitment.

The Trustee also focuses briefly on the use in Section 2.20 of the Credit Agreement of certain terms which it argues are indicative of the requirement that funding be in cash. In reference to the Incremental Term Loans, Section 2.20 in various places refers to lenders "mak[ing] term loans" or "provid[ing] loans" in an "amount" specified by Realogy.[42] For the same reasons set forth above, these are uncompelling arguments.

The Trustee lastly points to the reference to the "application of the proceeds" of incremental loans in Section 2.20, arguing that this is likewise proof of the necessity of funding the loans in cash.[43] Reading the clause which refers to "proceeds" in context obviates the need for such an interpretation. Section 2.20(c)(iii) requires that at the time new loans are made Realogy be in compliance, on a pro forma basis, with certain financial performance covenants after giving effect to the loans made and the application of the proceeds from those loans.[44] In the case of the Second Lien Term Loans, the application of the proceeds would mean the cancellation of the prior indebtedness evidenced by the

---

**40.** Section 2.20(a)(ii) states "the aggregate amount of all Incremental Term Loan Commitments and Incremental Revolving Facility Commitments, when taken together with all other Incremental Commitments, shall not exceed $650.0 million in the aggregate...."

**41.** Pls.' Answering Br. 10.

**42.** *See* Pls.' Answering Br. 12.

**43.** *Id.*

**44.** Section 2.20(c)(iii) of the Credit Agreement states:

> [T]he Borrower shall be in Pro Forma Compliance after giving effect to such Incremental Term Loan Commitment and/or Incremental Revolving Facility Commitments, the Loans to be made thereunder and the application of the proceeds therefrom as if made and applied on such date.

surrendered notes. This would result in a decrease in both the unsecured debt of Realogy and the annual interest expense of Realogy. This decrease could be a key factor in determining whether Realogy would conform with its financial performance covenants under the Credit Agreement after giving effect to the new term loans. The reference to the "application of proceeds" in Section 2.20(c)(iii) is therefore just as vital in the note-funded loan context as in the cash-funded one.

### 2. Arguments Based On Procedural And Ministerial Terms

The Trustee points to certain procedural and administrative provisions of the Credit Agreement as evidence that only cash-funded loans are permitted. Section 2.03, entitled "Requests for Borrowings," requires that as part of the required notice of a borrowing request, Realogy "shall specify ... the location and number of the Borrower's account to which funds are to be disbursed." [45] Because, the Trustee argues, Section 2.03 states that Realogy "shall specify" bank account information in borrowing requests, it must be that all loans are required to be funded in cash. "Otherwise," the Trustee seemingly asks, "why require the bank account?"

The Trustee makes too much of this provision. The purpose of Section 2.03 is to specify the process for initiating a loan. In a *typical* borrowing under the Credit Agreement, the new loan will be funded in cash. It will therefore of course be necessary for JPM as the administrative agent to disburse the funds to Realogy. In order to facilitate this process, the borrowing request procedure thus "requires" an account into which funds are to be disbursed. It proves too much, however, to read this as permitting only transactions in which a disbursal account would be necessary. Such a requirement would prohibit transactions explicitly anticipated and authorized by the very same section of the Credit Agreement. Section 2.03 permits Realogy to request a new revolving loan in order to fund an obligation to reimburse a letter of credit disbursement.[46] The creation of such a loan requires no disbursement of funds. Rather, the loan is created in consideration of the extinguishment of Realogy's obligation to reimburse the Lenders for funding under a letter of credit drawn on the credit facility. Thus, if Section 2.03 were read to prohibit transactions that did not require the disbursal of cash to bank accounts, a nonsensical result would occur. Under that interpretation, the Credit Agreement would, in Section 2.03, specify the rules for initiating the revolver draw to fund the letter of credit repayment obligation, then go on to forbid that same transaction. This cannot possibly be right. The better reading is that Section 2.03 places procedural requirements on the initiation of borrowings, and not substantive

---

**45.** *See* Credit Agreement § 2.03(vi).

**46.** Section 2.03 of the Credit Agreement requires that "any such notice of an ABR Revolving Facility Borrowing to finance the reimbursement of an L/C Disbursement as contemplated by Section 2.05(e) may be given not later than 10:00 a.m., Local Time, on the date of the proposed Borrowing." Section 2.05(e)(i) reads, in pertinent part:

If the applicable Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such L/C Disbursement by paying to the Administrative Agent an amount equal to such L/C Disbursement in Dollars ...; *provided*, that, in the case of any L/C Disbursement made in Dollars, the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 or 2.04 that such payment be financed with an ABR Revolving Facility Borrowing ... in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Resolving Facility Borrowing. ...

requirements on the form of the borrowing transaction.

The Trustee makes similar arguments with respect to Section 2.06 of the Credit Agreement.[47] For the same reasons, these arguments cannot prevail.[48]

## V.

■ The Trustee also urges that the proposed transaction is prohibited by the negative covenants contained in Section 6.09 of the Credit Agreement. Specifically, the Trustee argues, the refinancing of the Senior Notes with the Second Lien Term Loans does not constitute Permitted Refinancing Indebtedness under the Credit Agreement.[49] Thus, the Trustee argues, the proposed exchange transaction for the Senior Notes is prohibited by Section 6.09(b)(i). Because the language of the

47. *See* Pls.' Answering Br. 10. Section 2.06(a) of the Credit Agreement states, in pertinent part:

Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, Local Time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.... The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower as specified in the Borrowing Request; provided, that ABR Revolving Loans ... made to finance the reimbursement of a L/C Disbursement and reimbursements as provided in Section 2.05(e) shall be remitted by the Administrative Agent by the Administrative Agent to the applicable Issuing Bank.

48. The court finds the Trustee's argument that the Credit Agreement forbids the proposed transaction because it is not funded in cash unconvincing for another reason as well. The Trustee does not appear to dispute that (at least in the absence of the restriction in Section 6.09 discussed below) the proposed refinancing would be permissible if the Second Lien Term Loans were funded in cash. Thus, for example, the noteholders could hypothetically be invited to commit to fund (in cash) Incremental Term Loans under the Credit Agreement. In order to participate as Incremental Term Lenders, the noteholders would also have to tender their notes for redemption at an announced price. (Specifically, the noteholders would be required to tender their notes for redemption at the price implied by the present exchange offer. *See supra*, I.B. notes 4–6 and accompanying text.) Noteholders would only be allowed to offer commitments up to the exchange value of the notes they were tendering.

On the closing date, the participating noteholders would then wire their commitments to JPM, who would in turn wire the aggregate amount to Realogy. Realogy would then wire the whole thing back to JPM Securities. JPM Securities, acting as dealer-manager, would use the wired funds to take up the tendered notes, delivering the funds to the tendering noteholders. Of course, these would be the same parties as the Incremental Term Lenders. Moreover, each lender would receive the exact amount of cash they had remitted at the beginning of this Rube Goldberg-esque hypothetical transaction. (continued ...)

The entire transfer of money from the lenders, to JPM, to Realogy, to a JPM affiliate, and back to the lenders, would have, taken as a whole, no economic reality whatsoever. The final state of affairs, meanwhile, would be identical to that of the actual proposed transaction. The tendered notes would be cancelled, and in their place the Incremental Term Lenders would now hold new Second Lien Term Loans. Thus, in the Trustee's view, the actual proposed transaction, while far simpler and more efficient, would be prohibited. Meanwhile, the economically equivalent hypothetical transaction, with all its unnecessary complication, would be permitted. It strikes the court as less than commercially reasonable that the parties to the Credit Agreement would have intended such a result, at least in the absence of more explicit language requiring it. It only tends to fuel the court's skepticism that it is a non-party to the Credit Agreement that urges this absurdist conclusion, purely for its own benefit.

49. Both parties agree that as to the Senior Subordinated Notes, the proposed exchange cannot, and need not, meet the requirements for Permitted Financing Indebtedness. This is because only $125 million of Second Lien Term Loans will be offered in exchange for

Credit Agreement is more than a little complex, a short overview is in order.

Article VI of the Credit Agreement contains a series of negative covenants which restrict Realogy's ability to take certain actions.[50] Section 6.09(b) addresses limitations on Realogy's right to make payments on the "Notes," which is a defined term encompassing both the Senior Notes and the Senior Subordinated Notes. Unless a specific exception exists, Section 6.09(b)(i) flatly prohibits any payment of principal or interest, or any distribution of property in redemption or exchange for the Notes.[51] The key provision at issue here is found in Section 6.09(b)(i)(A), which excepts refinancings permitted by Section 6.01(1).

Section 6.01 contains a general prohibition against the incurrence of new indebtedness by Realogy, subject to a litany of exceptions. Section 6.01(1) enables Realogy to initially incur the debt under the Senior and Senior Subordinated Notes. It also permits Realogy to incur Permitted Refinancing Indebtedness in order to refinance the Senior and Senior Subordinated Notes.[52]

Permitted Refinancing Indebtedness is defined, subject to a number of significant restrictions, to be any indebtedness issued in exchange for, or the net proceeds of which are used to refinance, the indebtedness being refinanced.[53] The parties do

---

Senior Subordinated Notes. This allows the proposed exchange transaction for the Senior Subordinated Notes to fit within the $150 million basket in Section 6.09(b)(i)(F). *See infra*, note 51.

**50.** The preamble to Article VI states, in pertinent part:

The Borrower covenants and agrees with each lender that, so long as this Agreement shall remain in effect ..., unless the Required Lenders shall otherwise consent in writing, the Borrower will not, and will not permit any of the Material Subsidiaries to: Each section of Article VI is then devoted to a specific category of prohibited activity. The sections generally begin with a broad prohibition, which is then followed by a series of exceptions.

**51.** Section 6.09(b)(i) of the Credit Agreement reads, in pertinent part:

[Realogy covenants not to] [m]ake, or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal or of interest on Indebtedness outstanding under the Notes or any Permitted Refinancing Indebtedness in respect thereof ... ("Junior Financing"), or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination in respect of any Junior Financing except for

(A) Refinancings permitted by Section 6.01($l$), (r), or (v),
(B) payments of regularly scheduled interest, and, to the extent this Agreement is then in effect, principal on the scheduled maturity date of any Junior Financing,
\* \* \*
(F) so long as no Default or Event of Default has occurred and is continuing or would result therefrom and after giving effect to such payment or distribution the Borrower would be in Pro Forma Compliance, payments or distributions in respect of Junior Financings prior to their scheduled maturity made, in an aggregate amount, not to exceed ... (x) $150 million....

**52.** Section 6.01(1) of the Credit Agreement provides, in pertinent part:

[Realogy shall not incur, create, assume or permit to exist any Indebtedness, except:]

($l$) Indebtedness of the Borrower pursuant to (i) the Senior Unsecured Notes in an aggregate principal amount that is not in excess of $2,250.0 million (plus any interest paid by increases to principal), (ii) the Senior Subordinated Notes in an aggregate principal amount that is not in excess of $900.0 million, and (iii) any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness.

**53.** Section 1.01 of the Credit Agreement defines Permitted Refinancing Indebtedness to mean, in pertinent part:

not dispute the proposed transaction's conformance with the majority of those restrictions. The restriction at issue is contained in subpart (d) of the definition.[54]

Subpart (d) contains an admittedly strange structure. It begins by flatly prohibiting the granting of greater security to the Permitted Refinancing Indebtedness than the indebtedness being refinanced had. It then contains a notable proviso. Subpart (d)(ii) provides that "other guarantees and security may be added to the extent then permitted under Article VI. . . ." It is the meaning of this proviso which the parties dispute.

It is clear that absent the proviso in subpart (d)(ii), the proposed exchange transaction would as presently structured be prohibited. The proposed Second Lien Term Loans are secured. The Senior Notes are unsecured. The refinancing indebtedness would thus have greater security than the indebtedness being refinanced.

But what then of subpart (d)(ii)? Realogy argues that it means that, notwithstanding the prohibition in the initial part of subpart (d), if the security interest being granted is permitted by the negative covenants of Article VI, it may be added to the refinancing indebtedness. Realogy then points to Section 6.02(b), which permits the creation of liens under the Loan Documents, which includes the Credit Agreement. Since Article VI permits the creation of liens under the Credit Agreement, Realogy argues, those liens may be "added" to the Permitted Refinancing Indebtedness over and above the security to which the refinanced indebtedness was entitled, by virtue of subpart (d)(ii).

The Trustee responds that such an interpretation of subpart (d)(ii) would make (d)(ii) the exception that swallows the rule of subpart (d). Because any transaction would ultimately be required to meet the restrictions contained in Article VI, the existence or non-existence of subpart (d) would have no effect on the ability of Realogy to lien up refinancing indebtedness. In other words, with respect to the granting of security interests to Permitted Refinancing Indebtedness, subpart (d) as to the definition of that term would be mere surplusage. The Trustee argues that because interpretations of an unambiguous contract that render provisions meaningless are disfavored under the

---

"Permitted Refinancing Indebtedness" shall mean any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); provided that . . . (d) no Permitted Refinancing Indebtedness shall have different obligors, or greater guarantees or security, than the Indebtedness being Refinanced; (provided that (i) Indebtedness (other than the Notes) (A) of any Loan Party may be Refinanced to add or substitute as an obligor another Loan Party that is reasonably satisfactory to the Administrative Agent and (B) of any Subsidiary that is not a Loan Party may be Refinanced to add or substi-

tute as an obligor another Subsidiary that is not a Loan Party and is reasonably satisfactory to the administrative Agent and (ii) other guarantees and security may be added to the extent then permitted under Article VI). . . .

54. Although the Trustee asserts that the proposed transaction also fails to comply with subpart (e) of the definition of Permitted Refinancing Indebtedness, this argument lacks any merit whatsoever. On its face, subpart (e) only applies "if the Indebtedness being Refinanced is secured by any collateral. . . ." The refinanced indebtedness at issue here is the Senior Notes, which are unsecured. Thus subpart (e) cannot be applicable to the present transaction.

law,[55] that this interpretation is wrong.[56]

Instead, the Trustee urges, subpart (d)(ii) means that to the extent that the indebtedness being refinanced could then be liened up in accordance with Article VI, the corresponding Permitted Refinancing Indebtedness would likewise be allowed to be liened up. Thus, for example, certain unsecured notes might be permitted to be granted security under certain conditions. To the extent those conditional rights had vested, such security could be added when refinancing those notes.

The Trustee's interpretation is the better one. It renders all of subpart (d) meaningful, without turning any of it into apparent surplusage. The alternative interpretation would allow a mere proviso clause to entirely sap the vitality of what would otherwise be a significant restriction.

There is no right in the Senior Notes to additional security, nor is there any provision in Section 6.02 that would permit it. As a result, the refinancing of the Senior Notes with Second Lien Term Loans does not qualify as Permitted Refinancing Indebtedness. The exception in Section 6.01($l$) to the general prohibition under Section 6.09(b)(i) of the Credit Agreement therefore does not apply. Lacking any other applicable exception under Section 6.09(b)(i), the Second Lien Term Loans

(and the liens supporting them) are prohibited under Section 6.09 of the Credit Agreement. The Second Lien Term Loans therefore cannot constitute indebtedness "under the Credit Agreement." [57] As such, the liens supporting the Second Lien Term Loans do not constitute Permitted Liens under subsection (6)(B) of the definition of Permitted Liens in the Indenture. The defendant can point to no other provision of the definition of Permitted Liens to require a different outcome. The creation of these liens is therefore not exempted from the requirements of Section 4.12 of the Indenture. As such, the proposed transaction if consummated will constitute a breach of the Indenture.

Realogy argues that, even if the current terms of the Credit Agreement do not permit the proposed transaction, by virtue of Section 2.20(b), the Credit Agreement is automatically deemed amended to permit it.[58] Realogy further avers, and offers evidence to show that, JPM as administrative agent has approved and will execute the Incremental Assumption Agreement for the Second Lien Term Loans.

Realogy's argument reads the words of Section 2.20(b) too selectively. Section 2.20 of the Credit Agreement reads, in pertinent part:

**55.** *See, e.g., Whitebox Convertible Arbitrage Partners, L.P. v. IVAX Corp.,* 482 F.3d 1018, 1021–22 (8th Cir.2007) (applying New York law to a trust indenture).

**56.** The Trustee also makes a gratuitous argument that if the Credit Agreement meant sections other than 6.01($l$), (r), or (v) to act as exceptions to Section 6.09(b)(i), it would have explicitly listed them along with sections 6.01($l$), (r) and (v) in Section 6.09(b)(i)(A). This argument is wrong for two reasons. First, even under Realogy's interpretation, none of the provisions of Article VI become additional exceptions to Section 6.09(b)(i). Although subpart (d)(ii) may eviscerate the

restrictions on the adding of security contained in the beginning of subpart (d), the other restrictions on Permitted Refinancing Indebtedness contained in subparts (a) through (c) and (e) would remain unaffected. Second, as a practical matter, if every indirect reference to a provision in the Credit Agreement were expanded out, it would turn the document from difficult to read into impossible to read.

**57.** Indenture § 4.09(b)(1).

**58.** Def.'s Answering Br. 23.

Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Assumption Agreement, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Incremental Term Loan Commitments ... evidenced thereby as provided for in Section 10.08(e). Any such deemed amendment may be memorialized in writing by the Administrative Agent with the Borrower's Consent (not to be unreasonably withheld) and furnished to the other parties hereto.

From this alone, the clear import of the language is that execution of the Incremental Assumption Agreement acts to amend the Credit Agreement to incorporate the terms of the new Term Loans. This does not mean, however, that prohibited transactions under the Credit Agreement are transmogrified into permitted transactions by virtue of engaging in them under the accordion facility. In case there might be any doubt as to the matter, Section 10.08(e) removes it. Section 10.08(e) reads:

Notwithstanding the foregoing, technical and conforming modifications to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent to the extent necessary to integrate any Incremental Term Loan Commitments or Incremental Revolving Facility Commitments on substantially the same basis as the Term Loans or Revolving Facility Loans, as applicable.

Read together, it is clear that Section 2.20(b) and 10.08(e) only permit "technical and conforming modifications" to the terms of the Credit Agreement by virtue of the consent of Realogy and the administrative agent alone. Whatever else a modification that eviscerates a prohibition under the negative covenants of Article VI may be, it is not "technical and conforming." Section 2.20(b) is thus no help to Realogy's predicament. If Realogy wishes to engage in the proposed transaction, it would need to obtain agreement from the required number of its bank lenders to amend or waive certain provisions of the Credit Agreement.[59]

## VI.

For the reasons set forth above, judgment for the plaintiffs is granted as to Counts I and II. Counsel for the plaintiffs shall submit an order in conformity with this opinion, on notice, by Monday, December 22, 2008.

**59.** The court notes the irony contained in the present situation. The Trustee, a non-party to the Credit Agreement, is suing to enforce a document whose terms are not for the Trustee's benefit. Moreover, those terms can be amended to remedy the prohibitions the Trustee relies on at any time, without the consent of the Trustee or the Senior Toggle Noteholders. Thus, as to the Trustee and the Senior Toggle Noteholders, it is little more than fortunate happenstance that they are able to find a provision in the Credit Agreement on which to rely to block the proposed transaction. Nevertheless, the court must construe the agreements as they stand, not as they might be.